**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

**Case No. 00-6049-CR-DIMITROULEAS/LYNCH**

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| **Plaintiff,** | : |
| | : |
| vs. | : |
| | : |
| **SAMUEL VELEZ, JR.,** | : |
| **ANTHONY GARILLI, and** | : |
| **JOSEPH SALINA** | : |
| | : |
| **Defendant.** | : |



### DEFENDANT SAMUEL VELEZ, JR.'S
### OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT

**COMES NOW,** Defendant SAMUEL VELEZ, JR. ("Mr. Velez") by and through his

undersigned counsel. and hereby files his Objections to the Presentence Investigation Report

("PSR").

### I.    PRELIMINARY STATEMENT

On or about August 17, 2000, the United States Probation Department prepared a

Presentence Investigation Report ("PSR") which makes recommendations under the United

States Sentencing Guidelines ("USSG") concerning Mr. Velez' sentence to be imposed under his

Plea Agreement (Dkt. # 24) for tax evasion.

This prosecution arises out of a garden-variety tax evasion scheme in which Mr. Velez

and his three co-owners of a Gold's Gym in Fort Lauderdale (the "Gym"): (a) "skimmed" cash

from various Gym revenue sources. such as its juice bar and café; (b) divided the cash equally;

and (c) failed to report the cash payments on both the corporate tax returns and their individual

returns. It is unrefuted that all material decisions concerning the tax evasion scheme. including

the decision to skim unreported cash, were made by all four of the co-owners (including Mr.

WPB:116980:2

Velez) jointly, and pursuant to a vote of each owner's equity interest in the Gym, of which Mr. Velez was only a 30% minority shareholder.

The PSR's scant description of the offense fails to mention the fact that another unindicted co-conspirator who cooperated with the Government to avoid prosecution (Louis Blas ("Blas")), was the de facto comptroller of the Gym, initiated the cash skimming scheme, handled the division of cash among the partners, and prepared and managed all of the Gym's financial information. It is Blas, not Mr. Velez, who regularly consulted with the Gym's accountant (co-defendant Joseph Salina ("Salina")), and who made decisions with Salina concerning the Gym's tax returns. In fact, Mr. Salina has a history, which can be gleaned from his Plea Agreement (Dkt. # 24), of "cooking the books" for other accounting clients.[1]

But, because Blas and another co-owner of the Gym, Thomas Griffin ("Griffin") have as of yet avoided prosecution, and the other co-conspirators have received a USSG § 5K1.1 sentencing recommendation from the Government, the PSR has anointed Mr. Velez the "leader" for USSG § 3B1.1 purposes. Yet to reach this conclusion, the PSR must strain to distort the facts concerning the operation of the Gym and the co-owners' joint tax evasion scheme, and ignore the fact that the cash skimming plan was so simple in nature, so easy in execution, that there was no need for any "leader." Further demonstrating that Mr. Velez did not "lead" the cash-skimming scheme is the fact that the other co-conspirators other than Mr. Velez had been involved in their own tax evasion schemes even before this conspiracy began.

We also urge that the Court provide Mr. Velez with proper "acceptance of responsibility" credit pursuant to USSG § 3E.1.1(b), which, assuming a 14 Base Offense Level, would result in

---

[1]     Salina's Plea Agreement (Dkt. # 24) makes specific reference to his numerous other "accounting" crimes and bad acts committed for other clients, and that as part of the plea deal, the Government agrees not to continue its investigation of his "other crimes."

United States of America v. Velez/Garilli
Case No. 00-6049-CR-DIMITROULEAS
Defendant Samuel Velez Jr.'s Objections
to Presentence Investigation Report

a two-level credit, reducing Mr. Velez' Offense Level for sentencing purposes to Level 12.

Sentencing Mr. Velez pursuant to a Offense Level 12 (rather than the Level 14 recommended by

the PSR) is also just and equitable, given that among the four co-owners of the Gym, who all

shared equal culpability for the tax evasion scheme, and the accountant (Salina) who prepared

the false journal entries and fraudulent tax returns, it is Mr. Velez alone who has been denied the

same leniency in Government sentencing recommendations as provided all of his equal co-

conspirators.

## II.    SPECIFIC OBJECTIONS[2]

### A.    THE PSR'S DESCRIPTION OF THE OFFENSE CONTAINS MATERIAL MISSTATEMENTS OR MISCHARACTERIZATIONS UPON WHICH THE PSR BASES ITS SENTENCING RECOMMENDATIONS.

The PSR contains numerous erroneous facts, assumptions, unwarranted conclusions, and

internal inconsistencies about the Offense Conduct and Mr. Velez' overall role in the Offense

Conduct. While the PSR notes that the Internal Revenue Service ("IRS") commenced an

investigation in 1996 into the activities of "Joseph Salina, Samuel Velez and Anthony Garilli"

after information "was received from an associate regarding the possible skimming of currency

from a business." (PSR, p. 5, ¶ 5), it ignores facts which contradict its working theory that Mr.

Velez alone was the "leader" to permit appropriate sentencing under the Guidelines. Instead, the

twelve (12) paragraphs of the PSR's Offense Conduct section (¶¶ 5 through 16), contain grave

factual omissions and inaccuracies which infects the entire PSR and undermines its

recommendations:

- **(PSR, ¶ 5)**.  The PSR fails to disclose that two co-conspirators and joint owners of the Gym that was the engine for the cash-skimming and tax evasion

---

[2]    For the Court's convenience, all references are to the actual pages and/or paragraphs of the PSR.

United States of America v. Velez/Garilli
Case No 00-6049-CR-DIMITROULEAS
Defendant Samuel Velez Jr.'s Objections
to Presentence Investigation Report

scheme, Blas and Griffin, went to the authorities in 1994 during a knock-down, drag out business dispute among the co-owners to report the cash-skimming in which each participated (and Blas initiated) to avoid prosecution.

- **(PSR, ¶¶ 7, 8, and 9)**. The PSR wrongly states that "Salina conspired with Velez and Garilli" to prepare false returns; and that Salina "took instructions from Velez and Garilli" concerning certain tax evasion events, and that Salina "consulted" with "Velez and Garilli" concerning journal entries. In reality, Salina conspired with all four owners of the Gym (Blas, Griffin, Garilli and Velez), and it was Blas and Garilli who provided Salina with the financial information and instructions and directions, if any, concerning the returns prepared and journal entries. Further, Salina had a history, unknown to Mr. Velez at the time, of "cooking the books" and making improper accounting decisions for clients. Finally, the PSR's assertion that "Salina was unaware of the skimming by the owners" is false and inconsistent with another representation in the PSR that in "1994" Salina allegedly "determined" that the Gym's "1993 profits were approximately $115,000." Yet when Salina prepared a 1993 personal tax return for one of the unindicted co-conspirators (Griffin), he did not include any pro rata portion of the "profit" in a K-1 for Griffin or on his personal return. This suggests that, in contrast to the PSR's assumptions, Salina *knew* of the cash-skimming scheme, and made unilateral decisions about how to account for the scheme in the corporate journals and resulting tax returns.

- **(PSR, ¶ 8)**. States that "Velez and Garilli diverted daily cash receipts" from the Gym, which was "stashed away at Velez' direction." It was not Mr. Velez, but Blas who initiated the cash-skimming (which was similar to a scheme Blas had used in an earlier business); who designated how much money could be skimmed each week; how much each co-owner could take, and where the money should be stored. (*See* Deposition Transcript of Louis Blas dated 7/8/97 ("Blas Dep.") attached as Composite Exhibit "1," p. 266, ln. 16 – p. 267, ln. 3; p. 309, lns. 2-9; p. 311, ln. 13 – p. 312, ln. 4).

- **(PSR, ¶¶ 11 and 12)**. The PSR alleges that Mr. Velez "directed" Salina to reduce profits and gains he received, and make "adjusting entr[ies] in the Gym's books" as a method of tax avoidance. Mr. Velez, who was a high school graduate unsophisticated in accounting principles, never directed Salina concerning any accounting issues. Instead, at most, Mr. Velez inquired of Salina if it were possible to reduce his own tax liability.

- **(PSR, ¶ 13)**. The PSR implies that Salina only prepared false individual tax returns for Messrs. Velez and Garilli for tax years 1993 and 1994. In fact, Salina prepared false returns for all four owners of the Gym, as well as the Gym's own corporate returns.

United States of America v. Velez/Garilli
Case No. 00-6049-CR-DIMITROULEAS
Defendant Samuel Velez Jr.'s Objections
to Presentence Investigation Report

- **(PSR, ¶¶ 14 and 15)**. The PSR wrongly states that Salina was only involved in fraudulent returns for tax year 1993, and that Mr. Velez used another accountant to understate his tax liability for 1994, and that this issue is presently under investigation. In fact, Mr. Velez' Plea Agreement (Dkt. # 77) encompasses tax years 1993 through 1994.

In stark contrast to the PSR, a proper recitation of the facts upon which Mr. Velez'

sentencing should be based includes the following:

- The Gym that was the engine of the cash-skimming was owned by Back-to-Back Enterprises of Florida, Inc. ("BTB, Inc.") a duly organized Sub-S Florida closely-held corporation which was organized in 1992 for the specific purpose of owning and operating the Gym.

- BTB, Inc., as a closely-held corporation, had only four owners/operators: Co-Defendant Anthony Garilli, Mr. Velez, and two unindicted co-conspirators, Blas and Griffin, who collectively founded the corporation. Griffin and Mr. Velez were former New York City police officers who were friends and colleagues upon retiring and relocating to South Florida. Mr. Velez knew Blas from the gym business in New York and subsequently met Garilli from the gym business in South Florida.

- All corporate decisions, as reflected in the corporation's by-laws, including the decision to divert cash from various revenue streams of the Gym, to divide the cash among the owners, and to not report the cash payments, were made pursuant to corporate voting procedure requiring each owner to vote his shares.

- As reflected in their "Shareholders' Agreement" dated December 8, 1992 (the "Shareholders' Agreement"), attached hereto as Exhibit "2," the voting stock of BTB, Inc. was divided as follows: Mr. Velez: 30%; Garilli: 30%; Blas: 20% and Griffin: 20%. Therefore, no one shareholder had majority control over the Gym's operation, and Mr. Velez was powerless to make unilateral decisions concerning the operation of the Gym, including the cash-skimming scheme. Instead, the only voting block that could have possibly made decisions for the Gym would have required Mr. Velez to join with Garilli against Blas and Griffin, or in the alternative with Messrs. Blas and Griffin against Garilli. Both scenarios demonstrate one thing: Mr. Velez was powerless to make any "leadership" decisions or direct the operation of the Gym or the cash-skimming scheme without the consent of the other shareholders.

- Each of the partners had co-equal control and decision-making authority concerning all decisions concerning the Gym, including the division of all

WPB:116980:2                                5

revenue received by the Gym. Although each partner had equal decision-making authority (including about the cash-skimming scheme), Florida law required that one of the owners be appointed as "president." Mr. Velez drew the proverbial "short straw" and for no other reason than happenstance and apathy among his partners. was Mr. Velez appointed as the figure head president of BTB, Inc.

- It was Blas and Garilli. not Mr. Velez, who initiated the decision to skim Gym's cash.

- Each of the partners in unison agreed to receive $500.00 per week as "director's fees as reflected in their Shareholders' Agreement" (*See* Exhibit "2"). All of the partners agreed that the cash should be shared among them. and not be disclosed to the IRS.

- Mr. Velez, a high school graduate, had absolutely no accounting or financial background, and was utterly incapable of providing direction to Salina concerning accounting, or tax reporting techniques.

- Instead. it was another unindicted co-conspirator, Blas, who, in sworn testimony in a civil suit between the owners, admitted that he was the "numbers man" among the four owners of the Gym -- the one who functioned as the de facto comptroller of the Gym. (*See* Composite Exhibit "1," p. 309, lns. 2-9: p. 311, ln. 13 – p. 312, ln. 4). Specifically,

  - it was Blas, not Mr. Velez, who made decisions and recommendations concerning the cash-skimming scheme, including from which sources of Gym revenue the owners could take their cut, and how much cash each owner could take out of the Gym. (Composite Exhibit "1," p. 266. ln. 16 – p. 267, ln. 3).

  - it was Blas, not Mr. Velez, who physically counted all of the Gym's cash, divided the cash each week into separate envelopes for each of the owners. (*See* Composite Exhibit "1," p. 266, ln. 16 – p. 267, ln. 3).

  - it was Blas. not Mr. Velez, who put each of the cash envelopes into the Gym's safe. (*See Id.*)

  - it was Blas. not Mr. Velez. who kept a cash journal during the conspiracy reflecting all of the total revenue received by the Gym, and how much each owner received. (*See Id.*)

  - and it was Blas. not Mr. Velez. who regularly interacted with Salina concerning tax and financial reporting issues. and who prepared the

> Gym's financial information for Salina's review. (*See* Deposition Transcript for Thomas Griffin dated 7/1/97 ("Griffin Dep."), attached as Composite Exhibit "3," p. 23, ln. 13 – p. 24, ln. 12).

- Although Salina ultimately made a series of false entries in the corporate books and accounting journals related to the Gym, and prepared false returns, he did not act at the direction of Mr. Velez concerning his activities. In fact, unknown to Mr. Velez at the time he was involved in the conspiracy, Salina had a history of preparing fraudulent returns and falsifying corporate records for Garilli and his companies and possibly for other clients, including Mr. Griffin. In fact, Salina's Plea Agreement (Dkt. # 24) alludes to other pending "criminal charges under investigation" against Salina, presumably concerning his penchant for preparing false returns and/or making false journal entries in client's books and records.

- In or about the Spring of 1994, there was a falling out among the four partners concerning a breach of contract which culminated in a civil lawsuit being filed by Blas and Griffin against Messrs. Velez and Garilli, styled, *Back to Back Enterprises of Florida, Inc., Tom Griffin and Louis Blas v. Back to Back Enterprises of Florida, Inc., Anthony Garilli and Samuel Velez, Jr., Case No. 95-16579(11), Broward County Circuit Court* (the "Civil Suit"). Specifically, Mr. Velez and Garilli raised at a board meeting the issue of whether the unreported cash payments to each of the four owners should cease. Griffin and Blas opposed the cessation of cash payments and commenced the Civil Suit. (*See* Composite Exhibit "1," p. 366, ln. 15, - p. 368, ln. 9).

- Following this 1994 meeting, Messrs. Blas and Griffin, believing that they were being squeezed out of the Gym's operation, and wanting the unreported cash payments to continue, brought the Civil Suit presumably to ensure the continued flow of unreported cash payments to them.

- During the pendency of Messrs. Blas' and Griffin's Civil sometime in the Summer of 1994, Blas and Griffin feared that the cash-skimming scheme would come to light and/or that Mr. Velez and/or Garilli would report them to the appropriate authorities for their role in the tax evasion scheme. Consequently, Messrs. Blas and Griffin, to avoid criminal liability for their co-equal involvement in the Gym cash-skimming/tax evasion conspiracy, first approached an agent of the IRS whom they knew from another fitness center, about the scheme.

United States of America v. Velez/Garilli
Case No. 00-6049-CR-DIMITROULEAS
Defendant Samuel Velez Jr.'s Objections
to Presentence Investigation Report

## B.    MR. VELEZ SHOULD NOT BE GIVEN A SECTION 3B1.1 LEADER ENHANCEMENT.

As demonstrated in Part II.A above, the PSR overemphasizes Mr. Velez role in the tax evasion scheme.[3] Further, the PSR is rife with internal inconsistencies which undermine its own conclusions, especially that Mr. Velez was the "leader" of the tax scheme. For example, throughout the PSR's description of the Offense Conduct, it gives co-defendant Garilli an equal role in many of the purported "leadership" activities. For example, in Paragraph 7, the PSR notes that the accountant Salina "took instructions from Velez *and Garilli*" to "reduce or eliminate taxable income on the corporate return." (Emphasis added). Likewise, in Paragraph 8, the PSR concludes that "Velez *and Garilli* diverted daily cash receipts from Back to Back." Similarly, in Paragraph 9, the PSR states that Salina "consulted" with "Velez *and Garilli*" concerning false journal entries. (Emphasis added). Throughout the PSR, *Garilli* is assigned a "leadership" role in the tax evasion scheme, yet the PSR strains credulity when it concludes that Garilli did not have "an aggravating or mitigating role" in the offense, and that only Mr. Velez should be given a 3B1.1 two-level enhancement. (*See* PSR, ¶¶ 17 and 18.) *Logically, if Garilli's role does not warrant an enhancement as noted by the PSR, neither should Mr. Velez'.*

More importantly, each of these conclusions about Mr. Velez' role is unfounded. The decision to divert the daily cash receipts was jointly made among all four owners of the Gym, of which Mr. Velez was a 30% minority shareholder, and it was Blas, not Mr. Velez, who consulted with Salina concerning the Gym's books and records, and the preparation of tax returns.

---

[3]    The only objective "fact" that the PSR could point to support its conclusion that Mr. Velez should be pinned with "leader" status instead of the other co-conspirators (most of whom are not even mentioned in the PSR), is that he was the titular "president" on the corporate records. This bare fact, which only reflects that Mr. Velez drew the proverbial short straw, and not that he "controlled" or lead the conspiracy, is insufficient as a matter of fact and law to warrant the PSR's recommendation of a two-level enhancement of Mr. Velez' offense level calculation.

United States of America v. Velez/Garilli
Case No. 00-6049-CR-DIMITROULEAS
Defendant Samuel Velez Jr.'s Objections
to Presentence Investigation Report

Similarly, the PSR is internally contradictory concerning its conclusion that Mr. Velez

"recruited Salina to assist him in evading taxes . . . "(*See* PSR, ¶ 17). But the PSR itself in an

earlier paragraph (¶ 6) finds that Salina was recruited by Garilli (not Mr. Velez) to handle the

books and tax reporting for a gym that Garilli owned prior to becoming a shareholder of BTB,

Inc. As the PSR itself notes, Salina had been the accountant for Garilli's prior corporation, "Bye

Bye New York" and had prepared Mr. Garilli's personal returns. When Mr. Velez invested in

Garilli's corporation, Salina continued as its accountant. Later, when Mr. Velez, and Garilli,

Griffin and Blas formed BTB, Inc., Salina became the accountant for this new enterprise. Thus,

in no way, did Mr. Velez "recruit" Salina.

The PSR makes other unwarranted assumptions to support its recommendations against

Mr. Velez, as follows:

- **(PSR, ¶ 8)**. An allegation that Mr. Velez "directed" that the skimmed cash be "stashed away" in the Gym's safe. This allegation is not only false, but even if true, it is irrelevant to a determination of whether Mr. Velez is "leader" under the Guidelines. First, it was Blas, not Mr. Velez, who designated *where* the skimmed cash should be stored for safe-keeping until it was divided equally among all four partners, including Mr. Velez. (*See* Composite Exhibit "2," p. 266, ln. 16, - p. 267, ln. 3). Second, even if Mr. Velez chose where the money would be stored (which he did not), this trivial "decision" which has little to do with the mechanics of the conspiracy itself, should not trigger "leadership" status under the Guidelines.

and,

- **(PSR, ¶¶ 11 and 12)**. An allegation that Mr. Velez "directed" Salina to reduce certain tax liability. At most, Mr. Velez inquired of Salina if it were possible to reduce tax liability: He had neither the compulsion nor the sophistication to direct Salina to do anything related to journal entries or tax reporting.

### 1.    *Mr. Velez Is Not an Organizer, Leader, Manager or Supervisor under USSG § 3B1.1.*

It is well-settled that a defendant only qualifies as an organizer, leader, manager or supervisor of a conspiracy for § 3B1.1 purposes if he has had a "real and direct influence" over the other participants in the conspiracy. *United States v. Pagan*, 196 F.3d 884, 892 (7th Cir. 1999). Courts which have examined the issue have generally held that whether a defendant's sentence calculation should be enhanced two-levels pursuant to § 3B1.1 turns on seven (7) factors, an analysis that is wholly lacking in the PSR:

1.    the defendant's exercise of decision-making authority;

2.    the nature of participation in the commission of the offense;

3.    the recruitment of accomplices;

4.    the claimed right to a larger share of the fruits of the crime;

5.    the degree of participation in planning or organizing the offense;

6.    the nature and scope of the illegal activity; and

7.    the degree of control and authority exercised over others.

*United States v. Mustread*, 42 F.3d 1097, 1104 (7th Cir. 1994), cited in *Pagan*, 196 F.3d at 892. Further, it has been held that the presence of a "single factor" among the seven in a sentencing evaluation "does not automatically justify the imposition of the enhancement." *United States v. Mankiewicz*, 122 F.3d 399, 405-06 (7th Cir. 1997). Rather, the factors must be weighted in light of the intent of the Guidelines section to "differentiate among relative degrees of responsibility" among co-conspirators. *Id. See also United States v. Vivit*, __ F.3d __, 2000 WL 722561, * 14 (7th Cir. June 6, 2000) (attached hereto as Exhibit "4") (same).

Courts have uniformly held that the gravaman of the enhancement is the "exercise of
control over other participants or the organization of others, for the purposes of carrying out the
crime." *United States v. Tagore,* 158 F.3d 1124, 1130 (10th Cir. 1998) (collecting cases).
Moreover, where as in this case, there are numerous participants and co-conspirators in one
alleged tax evasion conspiracy, it is important that the sentencing court:

> . . . make hierarchical distinctions between those at the very top of the criminal
> enterprise (the organizers or leaders) and those who, while in positions of
> executive authority, are lower on the totem pole (the managers or supervisors). In
> making such fine distinctions, the indicia of executive status include the
> defendant's role in recruiting accomplices, the degree and nature of the
> defendant's participation in planning and implementing the offense, the
> defendant's exercise of decision-making authority, and the defendant's level of
> remuneration relative to the other participants (including the presence or absence
> of a claimed right to a share of the crime's fruits).

*United States v. Savoie,* 985 F.2d 612, 616 (1st Cir. 1993) (collecting cases).

**2.    *A Proper Weighing of the Seven Factors Demonstrates that Mr. Velez
Should Not be Subject to "Leader" Enhancement.***

    a.    ***Factors 1, 2, 5, and 7: Mr. Velez Did Not Exercise Decision-
Making Authority or Control Over the Other Co-Conspirators,
and the Nature of His Participation in the Planning, Organizing
or Commission of the Offense Was No Lesser or Greater Than
the Other Co-Conspirators.***

Factors 1, 2 , 5, and 7 militate in favor of a finding that Mr. Velez should not be given
the recommended two-level enhancement. All decisions concerning the cash-skimming and tax
evasion scheme among the four co-owners of the Gym which forms the gravaman of the
Indictment, were made pursuant to a vote of each owner's respective voting shares in the
corporation. Specifically, because Mr. Velez held only a 30% ownership interest in the Gym, at
least one or more other co-owners, including the unindicted co-conspirators Blas and Griffin, had
to vote in favor of any decision concerning the cash-skimming scheme. *See Ronning,* 47 F.3d at

United States of America v. Velez/Garilli
Case No. 00-6049-CR-DIMITROULEAS
Defendant Samuel Velez Jr.'s Objections
to Presentence Investigation Report

712-13 (enhancement improper where the evidence indicated that even though the defendant had some "management responsibility," the co-conspirators ran the operation as "partners," and the defendant did not control or influence the other partner); *United States v. Katora,* 981 F.2d 1398, 1405 (3d Cir. 1992) (enhancement improper where co-conspirators were "equally culpable"); *United States v. Anderson,* 85 F. Supp.2d 1084, 1093-1100 (D. Kansas 1999) (in health care fraud conspiracy, sentencing court found enhancement proper for co-conspirator who devised scheme, directed payments to co-conspirators, coordinated and oversaw conspiracy, and had decision-making authority over timing and amounts of payments. By contrast, court found enhancement improper for co-conspirator who only "committed the crime," did not coordinate the conspiracy, and only oversaw his own receipt of money, such as in Mr. Velez' case.)

Further, it was the unindicted co-conspirator Blas, not Mr. Velez, who along with co-defendant Garilli, originated the idea of skimming cash from the Gym and sharing it among the four co-owners, and who functioned as the de facto comptroller of the Gym. Specifically, at the time the Gym's build-out and pre-sale of memberships commenced in October 1992, Blas and Garilli initiated the idea that each of the co-owners should be paid $500 per week. (*See* Composite Exhibit "2," p. 266, ln. 16, - p. 267, ln. 3). Further, in his "comptroller capacity," Blas made all material decisions concerning the cash-skimming operation, including what sources of Gym revenue should be used for the cash distribution; how much each owner should receive; the timing of the payments; even where the money should be held until distribution. (*Id.*) In addition, it was Blas (not Mr. Velez) who provided the accountant Salina with the Gym's financial information from which Salina prepared journal entries, and prepared corporate and personal tax returns for the Gym and its four owners. (*See* Composite Exhibit "2," p. 309, lns. 2-9; p. 311, ln. 13 – p. 312, ln. 4; Composite Exhibit "3," p. 23, ln. 13, - p. 24, ln. 12).

WPB:116980:2                                    12

                i.      *Mr. Velez' Polygraph[4] Further Supports a Finding That Among the Four Owners of the Gym, He Should Not Be Given a "Leadership" Enhancement.*

A recent polygraph examination also confirms that a § 3B1.1 enhancement for Mr. Velez would be unjust. The preeminent polygraphist, George P. Slattery, examined Mr. Velez on July 6, 2000 concerning five (5) questions which go to the very heart of the enhancement issue. Specifically, the results of the test establish that Mr. Velez: (a) was not the "leader" in the conspiracy to "conceal or divert cash" from BTB, Inc.; (b) did not direct anyone to divert cash from BTB, Inc.; (c) did not direct anyone to record entries in the books of BTB, Inc.; and (d) did not initiate the idea or plan to divert cash from BTB, Inc. *See* Exhibit "5." Taken together, Mr. Velez truthful responses to these polygraph questions compel the conclusion that it would be unfair and unjust to enhance his sentence calculation under USSG § 3B1.1.

                b.      *Factor 3: Mr. Velez Did Not Recruit Accomplices.*

The PSR implies that it was Mr. Velez who founded the Gym, and then set about to recruit the other 3 owners into the cash-skimming scheme. Yet, Mr. Velez did *not* create BTB, Inc. or the Gym and recruit the other "accomplices." BTB, Inc. was founded by four former friends and police officers in 1992 for the legitimate corporate purpose of owning the Gym – not to operate the tax evasion conspiracy. The joint, group decision to begin skimming unreported cash was made after the four owners came together to develop and operate the Gym, not before. Likewise, Mr. Velez did not recruit the accountant Salina into the conspiracy. Garilli had used

---

[4] During discussions with the Government, Mr. Velez' counsel offered to have Mr. Velez submit to a polygraph on pertinent "leadership" issues in an effort to have the Government stipulate in the Plea Agreement that Mr. Velez should not be given a § 3B1.1 enhancement. Further to the plea negotiations, Mr. Velez was examined on July 6, 2000 by George B. Slattery, recognized polygraph expert in this Circuit. Mr. Slattery's complete report is attached hereto as Exhibit "5", and is being offered to the Court to resolve the disputed facts concerning Mr. Velez role in the conspiracy. Pursuant to USSG § 6A1.3, the sentencing court is permitted to consider all "relevant information without regard to admissibility under the rules of evidence" concerning "any dispute" about a "factor important to the sentencing determination" such as polygraph results.

United States of America v. Velez/Garilli
Case No. 00-6049-CR-DIMITROULEAS
Defendant Samuel Velez Jr.'s Objections
to Presentence Investigation Report

Salina for similar purposes for fitness centers owned by Garilli before his association with Mr. Velez and later the other co-conspirators, and it was Garilli, not Mr. Velez, that brought Salina into the conspiracy.

        c.    ***Factor 4: Mr. Velez' Share In the Fruits of the Conspiracy Was Equal to His Equity Interest in the Corporation.***

Courts also evaluate whether a defendant has received a disproportionate share of the fruits of the conspiracy as an indicia of whether he holds a leadership position. *Mustread,* 42 F.3d at 1104. Yet here, the PSR provides no evidence that Mr. Velez received any larger proceeds from the cash-skimming scheme employed by the four owners of the Gym. As a matter of fact, Mr. Velez was only entitled to receive a share of the proceeds from all revenue of the Gym, including the skimmed, unreported cash, that was equal to his 30% minority interest. Moreover, the PSR does not refute that each of the co-owners of the Gym, including Mr. Velez, received an equal amount of skimmed cash per week ($500.00), and that Mr. Velez did not receive any greater percentage. This factor, like the others ignored by the PSR, weighs in Mr. Velez' favor. *See Pagan,* 196 F.3d at 893 (holding that enhancement improper in drug distribution conspiracy case where there was no "evidence that [defendant] directed the activities of anyone else . . . or received a share of the conspiracy's proceeds beyond the profits" from his own drug sales); *United States v. Bell,* 28 F.3d 615, 618 (7th Cir. 1994) (enhancement improper without evidence that defendant claimed larger cut of proceeds or exercised control over the other co-conspirators).

        d.    ***Factor 6: The Nature and Scope of the Illegal Activity Supports a Finding that Mr. Velez Was Not a "Leader."***

Finally, the simplistic nature of the tax evasion conspiracy scheme, and its narrow scope, also compels the conclusion that Mr. Velez was not the "leader." The PSR attempts to portray

the cash-skimming scheme as an elaborate, complex and sophisticated tax evasion conspiracy that must have had a mastermind behind it. Nothing could be more simple, or less in need of any "leadership," than the unsophisticated cash-skimming conspiracy of which Mr. Velez was a part. The garden-variety cash-skimming scheme had no elaborate concealment, subterfuge or tax avoidance attributes: The four owners simply diverted cash that came in through the Gym's juice bar and from certain retail sales, put it in an envelope stored in the Gym's safe, and divided up the money on a weekly basis. They later provided certain financial information to the Gym's outside accountant, Salina, who took steps to conceal the cash payments, and subsequently prepared false tax returns which did not properly reflect the cash payments made to each of the four owners. *Cf. United States v. Leonard*, 37 F.3d 32, 38 (2d Cir. 1994) (enhancement proper in tax evasion conspiracy case where there was evidence that co-conspirator instructed others on how to shred documents, the days of the week to skim funds, which corporate documents to alter to cover the trail of cash, how much should be skimmed, and gave instructions on how to create data-altering computer programs). Thus, the narrow scope of the offense itself favors a finding that Mr. Velez had no leadership role to support enhancement, and that his Offense Level before application of Section 3E1.1 should be 14, not 16.

## C. THE GOVERNMENT AND THE DEFENSE AGREE THAT MR. VELEZ IS ENTITLED TO A 3-LEVEL REDUCTION FOR ACCEPTANCE OF RESPONSIBILITY PURSUANT TO USSG § 3E1.1(b) IF HIS TOTAL OFFENSE LEVEL IS 16 OR GREATER.

The PSR properly provides Mr. Velez with a two-level reduction pursuant to USSG § 3E1.1(a) for his acceptance of responsibility. However, the Guidelines also provide that in the event that a defendant's Offense Level Computation prior to application of the reductions

United States of America v. Velez/Ganlli
Case No. 00-6049-CR-DIMITROULEAS
Defendant Samuel Velez Jr.'s Objections
to Presentence Investigation Report

provided by § 3E1.1 is "16 or greater," the defendant is also entitled to an additional one (1)-

level reduction if his acceptance or cooperation with the Government is "timely." (*See* USSG §

3E1.1(b)). Inexplicably, the PSR recommends a Level 16 Offense Level for Mr. Velez (which

we urge the Court to reject), but denies him an the full three-level § 3E1.1(b) reduction. (PSR,

¶ 30). Yet this recommendation is at odds with the Government's own position in Mr. Velez'

case that if the Court were to use a Level 16 Offense Level for Mr. Velez, equity militates in

favor of providing him with the full three-level acceptance of responsibility reduction[5].

Consequently, we strongly urge that the Court reject the PSR's recommendation that Mr. Velez

be denied the additional one-level reduction which is at variance both with the facts concerning

Mr. Velez' plea, as well as prevailing law of this Circuit.

## 1.    *Mr. Velez Has Properly Accepted Responsibility to Entitle Him to a Sentence Reduction*.

As acknowledged by the PSR, Mr. Velez has accepted full responsibility for his tax

evasion and conspiracy actions which form the basis of the Indictment. (PSR, ¶¶ 22 and 30). In

support of its finding that Mr. Velez has fully accepted responsibility, the PSR also includes a

detailed two (2) page "acceptance of responsibility" statement from Mr. Velez which chronicles

the scope and substance of his involvement in the crimes alleged, and demonstrates the depths of

his contrition. (PSR, ¶ 22). Specifically, Mr. Velez, in reviewing his actions, confesses that:

*    *    *

> I understood that what I was doing was wrong and that the information that IRS
> was receiving was incorrect as to my income and the others as well. . . I look
> back and sincerely regret the stupid decisions that I have made, which were
> admittedly born out of greed. It is especially painful for me having come from a
> strong law enforcement background. . . . To recognize that I willingly broke the

---

[5]    Prior to filing these Objections, the undersigned counsel spoke with the Government's AUSA Gregory E.
Tortella, Esq. by phone, who confirmed that the Government would not object to a full three-level reduction in Mr.
Velez' offense level for sentencing purposes if he is given a two-level enhancement for his role in the offense.
WPB:116980:2                                    16

United States of America v. Velez/Ganlli
Case No 00-6049-CR-DIMITROULEAS
Defendant Samuel Velez Jr.'s Objections
to Presentence Investigation Report

> law and now am now extremely painful for my family and me and brings me
> shame that I will never be able to reconcile.

\* \* \*

(PSR at ¶ 22). The Government not only believes that an additional one-level reduction for timely

acceptance is warranted in Mr. Velez' case if he is given a two-level "leader" enhancement, but also

acknowledges in the Plea Agreement (Exhibit "6", and Dkt. # 77) that Mr. Velez has fully and

affirmatively accepted personal responsibility for his actions without reservation (Plea Agreement, ¶ 4),

a factual stipulation which the PSR does not refute. Further demonstrating that the Government is

confident that Mr. Velez' acceptance of responsibility is sincere, complete, and without reservation, is

the fact that the Government has agreed to recommend that Mr. Velez be sentenced at the "low-end of

the guidelines range determined by the court." (Plea Agreement, ¶ 4).

## 2.    *The Facts and Law Support A Further One-Level Reduction Pursuant to USSG § 3E.1.(b).*

Under prevailing Eleventh Circuit law, if the Court adopts the PSR's and Government's

recommendation that Mr. Velez is entitled to a § 3E1.1(a) two-level reduction, and if his offense level

before application of the two-level reduction is 16 or greater, it is mandated that Mr. Velez be provided

the additional § 3E1.1(b) one-level reduction if his "acceptance" was "timely." *See United States v.*

*McPhee,* 108 F.3d 287, 289-90 (11th Cir. 1997); *see also United States v. Rice,* 184 F.3d 740, 742 (8th

Cir. 1999). The *McPhee* Court, relying on the well-reasoned decisions in other circuits, held that "once

a defendant is awarded a two-level reduction for acceptance of responsibility, whether or not to grant the

additional on-level reduction *is a matter of determining only whether the defendant timely . . . notified*

*authorities of his intention to enter a plea of guilty." Id.* (emphasis added). *See also United States v.*

*Townsend,* 73 F.3d 747, 755 (7th Cir. 1996); *United States v. Huckins,* 53 F.3d 276, 279 (9th Cir. 1995).

As succinctly put by the 8th Circuit in *Rice*:

WPB:116980:2                                              17

> If the sentencing court finds that the defendant accepted responsibility for his or her offense and entered a timely guilty plea, *then the defendant is automatically entitled to the full three-level reduction available under § 3E1.1. The language of § 3E1.1(b)(2) is mandatory; when all of its conditions are met, the court has no discretion to deny the extra one-level reduction. . . .*

*Rice.* 184 F.3d at 742 (citing, the 11th Circuit's *McPhee* decision, 108 F.3d at 289-90) (emphasis added). The granting of the additional one-level reduction is also consistent with the sentencing policy of this District.

### 3. Mr. Velez' Acceptance of Responsibility Was Timely, Warranting an Additional One-Level Reduction.

As acknowledged by the Government in the Plea Agreement[6] and during recent discussions in which the Government agreed that Mr. Velez should receive the full three-level reduction, Mr. Velez' acceptance was "timely". (Plea Agreement, ¶ 4). The case's chronology culminating in the Plea Agreement also demonstrates a finding that Mr. Velez' acceptance was "timely." There were no overtures from the Government to Mr. Velez to permit him to resolve this matter pre-indictment. Instead, the Government first opened plea negotiations with Mr. Velez and his counsel just prior to Mr. Velez' arraignment on March 20, 2000 (Dkt. # 30). Subsequently, on March 23, 2000, the Government proposed a plea offer to Mr. Velez. (*See* Exhibit "7"). Because of the terms of the proposed Plea Offer, the undersigned counsel informed the Government that it was not in a position to evaluate the merits of the Plea Offer until at least the Government's case-in-chief material was reviewed pursuant to the Court's Standing Discovery Order. The Government subsequently provided Mr. Velez and the other defendant's counsel, and Mr. Velez' forensic accountant expert, with access to the Government's case-in-chief material on May 31, 2000. This material, comprising more than 70 boxes of records, was

---

[6]    USSG § 6B1.4 ("Stipulations") recognizes that a plea agreement may contain such stipulation of facts relevant to sentencing.

evaluated by defense counsel during June and July. Further, based on certain of the Government's material as well as actions taken against other co-defendants. Mr. Velez filed certain limited pretrial motions in May (Dkt. # 55). and June (Dkt. # 69).

Following defense counsel's review of the Government's case-in-chief material, further plea discussions were had with the Government. Finally, on or about June 30, 2000, the Government informed defense counsel that if Mr. Velez accepted the proposed Plea Offer before the Court's Calendar Call on July 7, 2000 and before the Government's final preparation for trial, the Plea Offer was still available to Mr. Velez. Consequently, Mr. Velez entered into the Plea Agreement (Dkt. # 77) in advance of the Calendar Call as required by the Government, satisfying the Government's "timeliness" demands.

Having demonstrated his timely notifying the Government of his "intention to plead guilty," which permitted the Government to avoid preparing for trial and which conserved resources efficiently, the Government and Mr. Velez strongly urge that Mr. Velez be provided with the additional one-level reduction pursuant to USSG § 3E1.1(b) and prevailing law so that his resulting sentence under the Guidelines is just and equitable.

### III.   OTHER OBJECTIONS

In addition to the incorrect facts and erroneous conclusions noted above. the PSR also substantially misstates the status of Mr. Velez' financial condition. In Paragraphs 49 and 54, the PSR states that Mr. Velez received "$172,000" from the sale of the Gym in November 1999; that he repaid his wife "$150,000" for a loan related to a prior divorce, and that the $12,000 "remainder" was "placed in a Smith Barney Escrow Account." (*See* PSR, ¶ 49). Similarly, the PSR's Asset & Liabilities Summary for Mr. Velez, refers to a $38,000 "Smith Barney Escrow

United States of America v. Velez/Garilli
Case No. 00-6049-CR-DIMITROULEAS
Defendant Samuel Velez Jr.'s Objections
to Presentence Investigation Report

Account." (*See* PSR, ¶ 53). None of this is accurate. First, Mr. Velez' wife received $100,000 (not $150,000) from Mr. Velez' proceeds from the sale of the Gym for the loan repayment. Second, the $72,000 remaining from the sale was *not* deposited into any personal Smith Barney or other account, rather it has been used by Mr. Velez for his attorneys' fees. And third, the Smith Barney account referred to in the PSR is not Mr. Velez' personal account, nor is it an account to which he has access. Rather, it is an escrow account in the name of the Gym's corporation, BTB, Inc., and represents corporate assets being held to pay corporate obligations arising out of the proceeds form the sale of Gym, as well as certain promissory note payments relating to the deferred purchase price. (*See* Letter from Ira Marcus, Esq. dated September 12, 2000, attached hereto as Exhibit "8").

## IV.    CONCLUSION

For the reasons set forth above supported by the evidence to be presented during his sentencing hearing, Mr. Velez respectfully urges that the Court: (a) reject the PSR's unsupported recommendation that Mr. Velez be given a two-level enhancement for his role in the Offense Conduct; (b) provide Mr. Velez with the appropriate "acceptance of responsibility" reduction; and (c) sentence him according to Offense Level 12.

United States of America v. Velez/Garilli
Case No. 00-6049-CR-DIMITROULEAS
Defendant Samuel Velez Jr.'s Objections
to Presentence Investigation Report

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished U.S. mail this

_14th_ day of September, 2000 to: AUSA Greg Tortella, Esquire, S.C.E.S., P.O. Box 972, Ben Franklin

Station Washington, DC 20044, and by hand delivery to: Dennis Woolfolk, U.S. Probation Office, 300

N.E. 1st Avenue, Room 315, Miami, FL 33132.

**Respectfully submitted,**

**RUDEN, McCLOSKY, SMITH,
SCHUSTER & RUSSELL, P.A.
200 E. Broward Boulevard
Suite 1500 Ft. Lauderdale, FL 33301
Tel:  954/764-6660
Fax: 954/764-4996**

By:_____

**MARC S. NURIK
Florida Bar No. 272817
MICHAEL S. POPOK
Florida Bar No. 44131**

```
 1                              IN THE CIRCUIT COURT OF THE
                                17TH JUDICIAL CIRCUIT IN AND
 2                              FOR BROWARD COUNTY, FLORIDA

 3                              CASE NO.  95-16579 (11)

 4

 5
        BACK TO BACK ENTERPRISES OF    )
 6      FLORIDA, INC., by and through )
        TOM GRIFFIN and LOUIS BLAS and)
 7      THOMAS GRIFFIN, individually   )        CERTIFIED COPY
                                       )
 8                Plaintiffs,          )
                                       )
 9      vs.                            )         V O L U M E  II
                                       )
10      BACK TO BACK ENTERPRISES OF    )
        FLORIDA, INC., ANTHONY J.      )
11      GARILLI and SAMUEL VELEZ, JR.,)
                                       )
12                Defendants.          )
        _____)
13

14

15

16           .                      519 South Andrews Avenue
                                     Fort Lauderdale, FL 33301
17                                   Tuesday, July 8th, 1997
                                     10:19 a.m.
18

19           VIDEOTAPED DEPOSITION OF LOUIS BLAS

20                Taken before Beverly Bourlier James,

21      Registered Professional Reporter and Notary Public in

22      and for the State of Florida at Large, pursuant to

23      Notice of Taking Deposition filed in the above cause.

24                           - - - - -

25
```

· VIDEO                   Jessica R. Berman & Associates, Inc.    · LITIGATION SUPPORT
· TRI-COUNTY SERVICE                                              · CONFERENCE ROOMS

BROWARD (954) 463-4550        DADE (305) 651-4550        W. PALM BEACH (561) 659-5550

```
 1             Q.    On how many occasions did you give cash to

 2    Tom Griffin when you were associated with Back To

 3    Back?

 4                   MR. SAMILOW:   Objection, form.

 5                   MR. MARCUS:   What's the matter with the

 6    question, Counsel?

 7                   MR. SAMILOW:   It assumes facts not in

 8    evidence.   You haven't asked him any questions

 9    regarding that.   You have no predicate laid.

10    BY MR. MARCUS:

11             Q.    Okay.   You can answer.

12             A.    Ask me the question, again, please.

13             Q.    Sure.   On how many occasions did you give

14    cash to Tom Griffin while you were associated with

15    Back To Back?

16             A.    I gave all the shareholders of the

17    corporation an envelope, which was put in the safe on

18    a weekly basis and represented their salaries for that

19    week.

20             Q.    So, you were the person who would divide

21    up the cash and put it in envelopes?

22             A.    Yes.

23             Q.    Did you ever physically hand an envelope

24    to Thomas Griffin containing cash while you were at

25    Back To Back?
```

```
 1            A.      I don't remember, but I know I used to
 2    deposit it in the safe and it was up to them to open
 3    it up and get their salaries.
 4            Q.      So, when you say you don't remember doing
 5    so, are you saying here today that you may have done
 6    it but you just don't recall?
 7            A.      Yes, it's possible.
 8            Q.      Okay.  When you left Back To Back, did you
 9    have a job?
10            A.      When I left Back To Back, I started
11    working in the -- I think it was May 20th of '94, I
12    started working with Planet Fitness.
13            Q.      My question to you, sir, is, you left Back
14    To Back in March, '94, is that correct?
15                    MR. SAMILOW:  Objection, form.
16                    THE WITNESS:  Yes, around there.
17    BY MR. MARCUS:
18            Q.      So, my question to you, sir, is, when you
19    left Back to Back, did you then have a job?
20            A.      No, because I started in -- no, no.
21            Q.      Answer is no, is that correct?
22            A.      All right, that's right.
23            Q.      Now, what was your reason for leaving Back
24    To Back?
25            A.      I left because of their wanting to file
```

```
 1    information.
 2         Q.    Okay.  And who is in charge of that on
 3    behalf of Back To Back to issue the 1099's or W-2's?
 4         A.    In '92?
 5         Q.    Yes.
 6         A.    We didn't have anybody in charge of that.
 7         Q.    Wasn't it you?
 8         A.    Well, I was doing the accounting, yes, but
 9    I never -- I didn't issue no W-2's.
10         Q.    That was my next question.  Did you issue
11    any W-2's to Louis Blas for the year 1992?
12         A.    No.
13         Q.    Did you issue a W-2 to Tony Garilli in the
14    year 1992?
15         A.    No.
16         Q.    Did you issue a 1099 to Louis Blas for the
17    year of 1992?
18         A.    No.
19         Q.    Did you issue a 1099 to Mr. Garilli?
20         A.    No.
21         Q.    Did anyone else receive any monies from
22    Back To Back in the year 1992?
23         A.    In '92, no, not to my knowledge.
24         Q.    Did your wife?
25         A.    No, not in '92.
```

```
 1              Q.     Is that what happened with Back To Back?
 2              A.     I believe so.  I think Salinas took care
 3    of that tax information.
 4              Q.     Well, did you participate in providing Mr.
 5    Salinas information to have him prepare the '92 tax
 6    return?
 7              A.     No.
 8              Q.     You didn't?
 9              A.     All I did was give him on a monthly basis
10    the copies of the register, check register information
11    and Sam would take it over to him and they would
12    prepare -- come back with financials.
13              Q.     Well, wasn't it you who was the person who
14    regularly communicated with Mr. Salinas?
15                   MR. SAMILOW:  Objection, form.
16                   THE WITNESS:  I've talked to him, yes, but
17    on a regular basis, I think Sam was the one who used
18    to go up there and take care of business with him.
19    BY MR. MARCUS:
20              Q.     Well, do you know what Mr. Velez did when
21    he went up to Mr. Salinas?
22              A.     No.  Basically, gave him all the
23    information --
24              Q.     Well, you say --
25              A.     -- that I had given him.
```

1          Q.     When you say gave him the information, are

2     you saying that Mr. Velez delivered the documentary

3     information that you prepared to bring to Mr. Salinas?

4          A.     Yes, the check register.

5          Q.     Okay.  So, you don't know if Mr. Velez had

6     any substantive conversation with Mr. Salinas

7     regarding the finances of the club when he would bring

8     this information to him, do you?

9          A.     No, he never would tell me about

10    conversations he had with him.

11         Q.     So, you were the person who would

12    regularly communicate with Mr. Salinas regarding the

13    financial information of the club, correct?

14                MR. SAMILOW:  Objection, form.

15                THE WITNESS:  I didn't regularly call him

16    . at all.  Occasionally, I did talk to; him, I didn't

17    regularly talk to him at all.

18    BY MR. MARCUS:

19         Q.     Well, that's not true, Mr. Blas.

20                MR. SAMILOW:  Objection; form.  Move to

21    strike.

22                THE WITNESS:  Yes.

23    BY MR. MARCUS:

24         Q.     Isn't it true that you spoke to him every

25    month concerning sales tax reports?

1    Q.    Okay.  When was this meeting?

2    A.    Around March sometime.

3    Q.    Was Mr. Griffin present?

4    A.    Yes, he was.

5    Q.    Did you take notes?

6    A.    I didn't take notes.

7    Q.    Did anyone?

8    A.    Sam Velez was taking notes.

9    Q.    Okay.  I'll ask the question again.  Up to

10   that point in time of this March, 1994 -- was it a

11   shareholder or directors meeting?

12   A.    What, the '93?

13   Q.    No, '94.

14   A.    I'm sorry, I didn't get the question.

15   Q.    You attended a meeting where you were told

16   that the salaries were no longer going to be paid, is

17   that correct?

18   A.    Yes.

19   Q.    That was in '94, correct?

20   A.    Yes.

21   Q.    March of '94?

22   A.    Right.

23   Q.    Together?

24   A.    Right.

25   Q.    Now, up to that point in time, it's your

1    testimony that you were receiving $500 a week in cash?

2        A.    Yes.

3        Q.    And you were the one who was dividing the

4    money up and putting it in envelopes and putting it in

5    the safe, correct?

6        A.    That's correct.

7        Q.    And that money would be taken every week

8    by all four of you, correct?

9        A.    That's correct.

10        Q.    Okay.  And Mr. Garilli and Mr. Velez, at

11    this March, '94 meeting, said to you and Mr. Griffin

12    no more salaries, correct?

13        A.    That's correct.

14        Q.    And there was a vote on that, was there

15    not?

16        A.    Yes, there was.

17        Q.    And you voted no?

18        A.    That's correct.

19        Q.    You wanted to continue the cash payments,

20    did you not, yes or no?

21        A.    Okay, yes.

22        Q.    And they said no, correct?

23        A.    Correct.

24        Q.    And they said they wanted to accumulate

25    money to pay for the expansion of the club, correct?

1      A.      That's correct.

2      Q.      Now, you heard Mr. Griffin testify that he

3   voted no, too?

4      A.      That's correct.

5      Q.      And you were present when he voted no?

6      A.      Yes.

7      Q.      He wanted to continue the cash payments,

8   did he not?

9      A.      Yes.

10      Q.      Now, you heard Mr. Griffin say that there

11   was a figure of $210,000 that he said you said was

12   unreported.  Did you hear him say that the other day?

13      A.      I believe so, yes.

14      Q.      Was that $210,000 figure something that

15   you and he discussed?

16   .   A.      Yes.

17      Q.      And what did that $210,000 be comprised

18   of, what did it consist of?

19      A.      I believe that's in reference to the

20   analysis that I had prepared for the U.S. government.

21      Q.      And that consisted of profit plus the $500

22   a week in salary?

23      A.      Yes, it did.

24      Q.      And did that include the three months of

25   '92?

## SHAREHOLDERS' AGREEMENT

THIS AGREEMENT, made and entered into on this _8th_ day of _DECEMBER_ , 1992, by and between BACK TO BACK ENTERPRISES OF FLORIDA, INC., a Florida corporation, having its principal place of business located at 1436 East Commercial Blvd., Fort Lauderdale, Florida 33334, hereinafter sometimes referred to as the "CORPORATION", SAMUEL VELEZ, JR., whose address is 1441 Pelham Road, Wellington, Florida 33414, ANTHONY J. GARILLI, whose address is 1315 Island Shores Drive, West Palm Beach, Florida 33413, LOUIS BLAS, whose address is 6593 Buena Vista Drive, Margate, Florida 33063, and THOMAS GRIFFIN, whose address is 3850 Galt Ocean Drive, Apt. 1208, Fort Lauderdale, Florida 33308, hereinafter sometimes referred to individually as "SHAREHOLDER", and collectively as the "SHAREHOLDERS".

### W I T N E S S E T H:

### RECITALS

WHEREAS, the SHAREHOLDERS have paid their full share of the consideration for and therefore own all of the issued and outstanding capital stock of the CORPORATION, hereinafter referred to as the "SHARES", as follows:

| | |
|---|---|
| SAMUEL VELEZ, JR. | 30 |
| ANTHONY J. GARILLI | 30 |
| LOUIS BLAS | 20 |
| THOMAS GRIFFIN | 20 |
| | |
| Total | 100 |

WHEREAS, the CORPORATION and the SHAREHOLDERS believe it to be in their best interests to provide for the continuity of management and policies of the CORPORATION by imposing certain restrictions and obligations on themselves and the SHARES so as to arrange for the CORPORATION or the remaining SHAREHOLDERS to purchase the SHARES of a SHAREHOLDER who dies or desires to withdraw from the CORPORATION; and

WHEREAS, there is not now, nor is there likely to be in the future, a substantial market for the SHARES of the CORPORATION outside of the persons interested in the active operation and management of the CORPORATION; and

WHEREAS, it is the desire and intent of the SHAREHOLDERS that no SHAREHOLDER shall be required to sell his SHARES to another SHAREHOLDER or to the CORPORATION except as otherwise provided herein; and

WHEREAS, for the foregoing reasons, the parties hereto desire to provide (1) for the purchase by the CORPORATION or the

remaining SHAREHOLDERS of the SHARES of any SHAREHOLDER desiring to sell same; and (2) for the purchase by the CORPORATION or the surviving SHAREHOLDERS of the SHARES of a deceased SHAREHOLDER.

NOW, THEREFORE, in consideration of the mutual covenants, conditions, promises, restrictions, undertakings and agreements of the parties herein contained and for other good and valuable consideration, the sufficiency and receipt of which are hereby mutually acknowledged, it is mutually agreed by and between the parties to this Agreement as follows:

## ARTICLE I
## PRIOR AGREEMENTS/INCORPORATION

Any and all prior agreements between the CORPORATION and the SHAREHOLDERS relating to the transfer and restrictions on transfers of the SHARES of the capital stock the CORPORATION by the SHAREHOLDERS are, by this Agreement, hereby terminated and revoked and are hereby declared and made null and void and of no further force or effect. Additionally the foregoing recitals are true and correct and are incorporated herein by reference.

## ARTICLE II
## GENERAL RESTRICTIONS ON TRANSFER
## OF SHARES AND ADDITIONAL SHARES

2.01    RESTRICTION ON TRANSFER OF SHARES. No SHAREHOLDER shall at anytime during the existence of this Agreement, directly or indirectly, sell, assign, transfer, mortgage, encumber, pledge, hypothecate, or otherwise deal with or dispose of all or any part of the SHARES or any interest therein now owned or hereafter acquired by him without first obtaining the written consent of the other parties hereto, or, in the absence of such written consent, without first complying with the terms and conditions of this Agreement.

2.02    PRE-EMPTIVE RIGHTS. Every SHAREHOLDER, upon the sale for cash of any new SHARES of stock of the CORPORATION of the same kind, class or series, as that which he already holds, shall have the right to purchase his pro rata share thereof (as nearly as may be done without the issuance of fractional SHARES) at the price at which it is offered to others.

2.03    ISSUANCE OF ADDITIONAL SHARES. Any additional stock of the CORPORATION acquired by a SHAREHOLDER during his lifetime, either by purchase, stock dividend, or otherwise, shall be subject to the terms and provisions of this Agreement. Such additional SHARES shall be deemed to be included whenever reference herein is made to "SHARES".

2.04    INVOLUNTARY TRANSFER. Any person who becomes a holder of any SHARES of the CORPORATION by virtue of any judicial process, attachment, bankruptcy, receivership, execution, judicial sale, or by operation of law, shall immediately offer

such SHARES to the CORPORATION whenever it may request, at
one-half (1/2) the price established in accordance with Article
IV of this Agreement. The terms and conditions for any such sale
shall be as set forth in Article IV of this Agreement.

## ARTICLE III
### RESTRICTIONS

3.01   RESTRICTIONS ON GRANTING SECURITY INTEREST.   No
SHAREHOLDER shall, directly or indirectly, mortgage, encumber,
pledge, assign, hypothecate or transfer for financing purposes or
otherwise, give or grant any security interest in all or any of
his SHARES without first obtaining the written consent of the
other SHAREHOLDERS.   In the event such consent is obtained, no
such consent shall release any of such SHAREHOLDER'S SHARES from
the other restrictions contained in this Agreement, but such
restrictions shall merely become subject to the security interest
to which such consent expressly applies, for the duration of such
security interest only, and in the event the holder of such
security interest shall foreclose upon any such SHARES or
otherwise acquire any such SHARES or any interest therein, such
holder shall take such SHARES subject to the restrictions
contained in this Agreement and he shall be subject to all such
restrictions, the same as if such holder was a party to this
Agreement.

3.02   RESTRICTIONS ON TRANSFER.

A.   Right of First Refusal of CORPORATION:   Except
as otherwise provided herein, if a SHAREHOLDER desires, directly
or indirectly, to sell, assign, transfer, or in any way dispose
of   all   or   any   portion   of   his   SHARES,   such   SHAREHOLDER
(hereinafter called the "SELLING SHAREHOLDER") shall first serve
notice (hereinafter called the "OFFER TO SELL") to that effect
upon the CORPORATION and the other SHAREHOLDERS hereto, stating
i) the number of SHARES desired to be sold or otherwise disposed
of;   ii) the purchase price;   iii) terms of payment; and iv)
offering to sell such SHARES first to the CORPORATION and then to
the   other   SHAREHOLDERS,   in   accordance   with   the   terms   and
provisions hereof. The CORPORATION shall have the first right to
purchase or redeem all or any part of the SHARES, or any interest
in   such   SHARES,   so   offered   by   giving   notice   of   acceptance,
specifying the number of SHARES to be purchased, to the SELLING
SHAREHOLDER and the other SHAREHOLDERS within thirty (30) days,
(hereinafter referred to as the "THIRTY DAY OPTION PERIOD") after
receipt by the CORPORATION of the said OFFER TO SELL.    The
decision of whether or not the CORPORATION exercises said right
to purchase the SHARES, or any interest in such SHARES, owned by
the SELLING SHAREHOLDER pursuant to such OFFER TO SELL, shall be
made in the form of a resolution adopted by the SHAREHOLDERS at a
valid meeting, except that the SHARES owned by the SELLING
SHAREHOLDER shall not be considered as issued and outstanding for
determination of the existence of a quorum nor counted for a
majority vote.

B.   SHAREHOLDER Right to Purchase:   If the CORPORATION shall fail to exercise its right to purchase all of such SHARES, or a part thereof, or interest in such SHARES, each of the remaining SHAREHOLDERS shall have the right to purchase such portion of the SHARES, or interest in such SHARES, offered for sale and not accepted by the CORPORATION, in proportion to the number of SHARES owned by each SHAREHOLDER in relation to the number of SHARES owned by all of the SHAREHOLDERS (not including the SELLING SHAREHOLDERS' SHARES) by giving notice of acceptance (specifying the number of SHARES to be purchased) to the SELLING SHAREHOLDER and the other parties hereto within twenty (20) days (hereinafter referred to as the "TWENTY DAY OPTION PERIOD") following the close of the aforesaid THIRTY DAY OPTION PERIOD. However, if any SHAREHOLDER does not purchase his full proportionate share of such SHARES, or interest in such SHARES, the remaining SHAREHOLDERS shall have the right to purchase (proportionately among themselves, unless they shall agree otherwise) all or any part of the unaccepted SHARES, or interest in such SHARES, by giving notice of acceptance (specifying the number of shares to be purchased) to the SELLING SHAREHOLDER and the other parties hereto within ten (10) days (hereinafter referred to as the "TEN DAY OPTION PERIOD") following the close of the aforesaid TWENTY DAY OPTION PERIOD.

C.   Totality of Purchase:   If the CORPORATION or the other SHAREHOLDERS do not agree to purchase all of the SHARES so offered by the SELLING SHAREHOLDER then, and in that event, the SELLING SHAREHOLDER, at his sole and exclusive option and without penalty or liability, may, 1) withdraw his entire offer to sell as if it was never made, or 2) allow the sale of only a portion of his SHARES so offered to the CORPORATION or the other SHAREHOLDERS, or 3) sell all of his SHARES pursuant to and in accordance with Section 3.04 below.   Nothing herein contained shall be construed to mean that the SELLING SHAREHOLDER cannot sell the remaining and unaccepted portion of his SHARES so offered in accordance with the provisions of Section 3.04 below.

3.03   DETERMINATION OF PURCHASE PRICE AND TERMS.   In the event that any SHARES, or interest in such SHARES, are to be purchased pursuant to the foregoing provisions of this Article III, the following provisions shall apply:

A.   Price:   Each SHARE to be purchased pursuant to the foregoing provisions of this Article III shall be purchased at the price specified in Section 5.01 of Article V of this Agreement.

B.   Manner of Payment:   The purchase price of each SHARE to be purchased pursuant to the foregoing provisions of this Article III shall be paid in accordance with the provisions of Article V of this Agreement.

3.04   RIGHT OF SELLING SHAREHOLDER TO SELL.   In the event that the CORPORATION and the other SHAREHOLDERS fail,

4

refuse or are otherwise unable to purchase all of the SHARES offered for sale by the SELLING SHAREHOLDER pursuant to the OFFER TO SELL made in accordance with the provisions of this Agreement, and after the expiration of all of the aforesaid option periods, the SELLING SHAREHOLDER shall give written notice to the CORPORATION and the other SHAREHOLDERS stating the number of shares that were not accepted for purchase by the CORPORATION or the other SHAREHOLDERS. The CORPORATION and the other SHAREHOLDERS shall then have five (5) days in which to give written notice of acceptance should any or all elect to purchase such previously unaccepted SHARES. The priority of the CORPORATION's and the SHAREHOLDER'S purchase rights shall be in accordance with the provisions of Section 3.02 of Article III. Thereafter, the SELLING SHAREHOLDER shall be free to sell, transfer, or otherwise dispose of any SHARE or SHARES so offered pursuant to the OFFER TO SELL made and delivered in accordance with the provisions of this Agreement and not accepted for purchase by the CORPORATION and/or the other SHAREHOLDERS as hereinabove provided, to any person or entity, in any manner and upon any terms and conditions; provided, however, that such SELLING SHAREHOLDER shall not in fact sell, transfer or otherwise dispose of any SHARES or any interest therein to any person or entity, either for a price less than or on terms more favorable than the purchase price and the terms set forth in the OFFER TO SELL without first offering the CORPORATION and the other SHAREHOLDERS the right to purchase such SHARES, or interest therein, at the same price and upon the same terms as agreed between such SELLING SHAREHOLDER and any other person or entity. In carrying out the intent of the immediately preceding sentence, the same procedure as specified in Section 3.02, above, shall again be followed, except that the notice provided the parties to this Agreement shall specify the name and address of the person or entity to whom the SELLING SHAREHOLDER proposes to sell his SHARES, or any interest therein, and the price and terms offered by such person or entity for such SHARES or interest therein. A copy of the contract for sale of such SHARES (subject to the rights of refusal herein granted) and evidence of payment by the purchaser under such contract of a deposit of at least ten percent (10%) of the purchase price under the contract shall be provided to the other parties to this Agreement by the SELLING SHAREHOLDER with the aforesaid notice. In the event that the CORPORATION and the other SHAREHOLDERS shall then fail, refuse or otherwise be unable to purchase all of the SHARES offered for sale pursuant to this Agreement, then after the expiration of all option periods as hereinafter described, the SELLING SHAREHOLDER shall then be free to sell to such other person or entity the SHARES, or interest therein, that were not purchased by the CORPORATION or the other SHAREHOLDERS as provided in this Agreement for the price and upon the terms set forth in such notice. Any sale, encumbrance or other disposition that may take place after the end of all applicable option periods specified above, must, in any event, take place within ninety (90) days following the close of all applicable option periods and, upon the expiration of such ninety (90) day period, the provisions of

this Agreement shall reattach to all of the SHARES, or interest therein not sold, transferred, or otherwise disposed of during

said ninety (90) day period.

3.05  APPLICATION TO TRANSFEREES.  The provisions of this Article III shall apply to the transferee of any SHARES, and any interest in such SHARES, including, by way of example and not by way of limitation, the donees, devisees, heirs or personal representative of the estate of any deceased SHAREHOLDER or the beneficiary of any SHARES, and any interest in such SHARES.

## ARTICLE IV
### PURCHASE OF STOCK ON DEATH

4.01  CORPORATION TO REDEEM STOCK OF DECEASED SHAREHOLDER.  Upon the death of a SHAREHOLDER, the personal representative of the estate of the deceased SHAREHOLDER shall sell to the CORPORATION and the CORPORATION shall be obligated to purchase the SHARE(S), and any interest in such SHARE(S), owned by the deceased SHAREHOLDER on the date of his death for the price hereinafter stipulated in Article V.  The personal representative of the estate of the deceased SHAREHOLDER shall serve notice of the death of the deceased SHAREHOLDER on the CORPORATION and on each of the other SHAREHOLDERS within thirty (30) days after appointment as personal representative. Regardless of whether or not such personal representative shall serve the notice herein required, the CORPORATION shall be required to purchase all of the SHARE(S), and any interest in such SHARE(S), owned by the deceased SHAREHOLDER on the date of his or her death by giving notice of such right to purchase such SHARE(S), or interest in such SHARE(S), to the personal representative of the estate of the deceased SHAREHOLDER (or if there is no personal representative appointed as of such time, then such notice may be given to the last address for such deceased SHAREHOLDER specified in accordance with this Agreement for receipt of notices in connection with this Agreement) and the other parties hereto anytime within sixty (60) days after appointment of the personal representative or within sixty (60) days after receipt of the personal representative's notice as hereinabove provided, whichever is latest.  Exercise of said right by the CORPORATION to purchase the SHARE(S) and any interest therein owned by the deceased SHAREHOLDER on the date of his death shall be made in the form of a resolution adopted by the SHAREHOLDERS and Directors at a valid meeting, except that the SHARE(S) owned by the deceased SHAREHOLDER on the date of his death shall not be considered as issued and outstanding in determining the existence of a quorum or counted for a majority vote.

4.02  DETERMINATION OF PURCHASE PRICE AND TERMS.  In the event that any SHARES are to be purchased pursuant to the foregoing provisions of this Article IV, the following provisions shall apply:                                                          .

6

A.  Price:  Each SHARE to be purchased pursuant to the foregoing provisions of this Article IV shall be purchased at the price specified in Section 5.01 of Article V of this Agreement.

B.  Manner of Payment:  The purchase price of each SHARE to be purchased pursuant to the foregoing provisions of this Article IV shall be paid in accordance with the provisions of Section 4.04 of this Article IV.

4.03  APPLICATION TO TRANSFEREES.  The provisions of this Article IV shall apply to the transferee of any of the deceased SHAREHOLDER'S SHARES and any interest in such SHARES, including, by way of illustration and not by way of limitation, the personal representative of any deceased SHAREHOLDER or his estate or the beneficiary or other successor to any of the deceased SHAREHOLDER'S SHARES, and any interest such such SHARES.

4.04  TIME AND METHOD OF PAYMENT.  Upon the closing of any sale pursuant to this Article IV, the CORPORATION shall pay the purchase price therefor as follows:

A.  Negotiable Note for any Balance Due:  Any part of the purchase price which is not paid in cash shall be evidenced by a negotiable promissory note of the CORPORATION payable to and delivered to the seller.  Such promissory note shall bear interest at an annual rate which is equivalent to the commercial prime rate on loans offered by the bank which is the primary depository of the CORPORATION, or its successor or successors, to its most credit-worthy commercial customers as of the date of the deceased STOCKHOLDER'S death.  Said promissory note shall provide for payment of principal and interest in sixty (60) equal monthly installments commencing one month from the date of the closing of such stock transaction.

B.  Other Required Provisions of Note:  The promissory note of the CORPORATION shall provide that it may be prepaid in whole or in part at anytime without notice, penalty, or premium.  Such negotiable promissory note shall provide for the acceleration of the maturity of the unpaid principal and interest at the option of the holder upon default in the payment of any installment of principal and interest and shall provide for the maker to pay all costs and expenses of collection, including reasonable attorneys fees.

C.  Pledge of Purchased Stock to Secure any Balance Due:

1.  All of the deceased SHAREHOLDER'S SHARE(S), or interest in such SHARE(S), purchased shall be pledged as collateral security to the Personal Representative of the deceased SHAREHOLDER to secure the full payment of the principal and interest on the negotiable promissory note which is

7

given by the purchaser to evidence any unpaid part of the
purchase price.

2.    Upon full payment of the principal and
interest of the negotiable promissory note, the deceased
SHAREHOLDER's SHARE(S), or interest in such SHARE(S), pledged as
collateral shall be released and delivered to the CORPORATION.

D.    Life Insurance Proceeds.    If the CORPORATION
shall receive any proceeds of any insurance policy insuring the
life of the deceased SHAREHOLDER, a portion of such proceeds not
in excess of of the purchase price payable by the CORPORATION
shall be paid by the CORPORATION to the personal representative
of the deceased SHAREHOLDER, and the amount of such payment shall
be deemed made on account of such purchase price and the
promissory note described in paragraph A above shall be reduced
accordingly.

4.05    CLOSING OF TRANSACTION.    The closing of such
purchase and sale of the SHARE(S) of a deceased SHAREHOLDER shall
take place at the offices of the CORPORATION at a date selected
by the President of the CORPORATION upon ten (10) business days'
notice, which date shall be not more than one hundred eighty
(180) days following the date of the qualified appointment of the
personal representative and not less than ninety (90) days
following such date.

4.06    The provisions of this Article IV shall be of no
effect if all of the SHAREHOLDERS shall die within ninety (90)
days of each other.

### ARTICLE V
### PURCHASE PRICE AND TERMS

5.01    DETERMINATION OF PURCHASE PRICE:    The CORPORATION
and the SHAREHOLDERS agree that the purchase price of each
SHAREHOLDER'S SHARES, whether the purchase results from a
transfer during lifetime or because of the death of a
SHAREHOLDER, shall be, until changed, as hereinafter provided,
the purchase price per SHARE initially entered on Schedule B
attached hereto and made a part hereof the same as if fully set
forth herein.    The SHAREHOLDERS, acting by a majority, shall
semi-annually redetermine the purchase price per SHARE and shall
endorse with initials upon Schedule "B" hereto such redetermined
purchase price per SHARE.

A.    Tax Consequences:    It is mutually agreed and
understood by and between the parties that the purchase price,
determined as set forth above, shall be the value of the
purchased SHARES for all tax purposes.    In the event such value
is later increased by any federal or state taxing authority, any
tax liability resulting from such increase shall be borne by the
selling SHAREHOLDER or the estate of a deceased SHAREHOLDER, as
the case may be.

8

5.02  <u>TIME AND METHOD OF PAYMENT.</u>  Within sixty (60) days after there has been an acceptance by the CORPORATION or the remaining SHAREHOLDERS, as the case may be, of an offer to purchase made by the SELLING SHAREHOLDER, any such purchaser of SHARES, or any interest therein, shall pay the purchase price, as more particularly described above, to the seller of such SHARES or his assignee in cash or upon such other terms and conditions as are mutually agreeable between the seller and the purchaser.

5.03  <u>CLOSING OF TRANSACTION.</u>  The closing of the purchase and sale of the SHARES shall take place within sixty (60) days from the date of acceptance of the offer by the CORPORATION or the other SHAREHOLDERS, as the case may be, on such date and time and at the offices of the CORPORATION, or such other place as may be mutually agreed upon.

ARTICLE VI<br><u>INABILITY OF CORPORATION TO PURCHASE SHARES</u>

If the appropriate corporate laws will not permit the CORPORATION to lawfully purchase all of the SHARES, should it elect to do so pursuant to the terms of this Agreement, the SHAREHOLDERS shall promptly take such measures to vote their respective holdings of the SHARES to reduce the capital of the CORPORATION, or to take such other steps as may be appropriate or necessary in order to enable the CORPORATION to lawfully purchase and pay for the SHARES offered for sale by the SELLING SHAREHOLDER or personal representative of a deceased SHAREHOLDER, including by way of example, and not by limitation, an up-to-date appraisal of the assets of the CORPORATION.  If the CORPORATION shall nevertheless be unable or refuse to purchase such SHARES, the remaining SHAREHOLDERS shall have the right to purchase such SHARES being offered as hereinabove provided for.

ARTICLE VII<br><u>INDEBTEDNESS OF A SHAREHOLDER</u>

In the event that there is a purchase and sale of SHARES, or interest therein, pursuant to the provisions of this Agreement and there is any indebtedness owed by the SELLING SHAREHOLDER or his estate to any party to this Agreement, then, notwithstanding the said provisions relating to the payment of the purchase price for such SHARES, any amount to be paid for the SHARES being purchased shall be first applied to reduce any indebtedness owed by the SELLING SHAREHOLDER, or his estate, to any other party under this Agreement.

ARTICLE VIII<br><u>S CORPORATION ELECTION</u>

If the CORPORATION is an "S" corporation (as such term is defined in Section 1362 of the Internal Revenue Code) at the time of the transfer and sale of the SHARES, the new SHAREHOLDER shall be required to consent in writing to either elect or revoke

9

such election in accordance with and pursuant to the desires of the other SHAREHOLDERS.

## ARTICLE IX
### ENDORSEMENT OF STOCK CERTIFICATE

Simultaneously with the execution of this Agreement, the SHAREHOLDERS shall surrender the stock certificates subject hereto to the CORPORATION and the following endorsement shall be placed on each certificate:

> The sale, transfer, encumbrance, or other disposition of this certificate is subject to the terms and conditions of an Agreement dated the _8th_ day of _DECEMBER_, 1992, by and between the holder of this certificate and others, restricting its transferability and calling for redemption upon the occurrence of certain events. A copy of said Agreement is on file in the office of the Secretary of the Corporation.

> The holder hereof, by accepting this certificate, acknowledges that the shares represented by this certificate have not been registered under the Securities Act of 1933. Such shares have been acquired for investment and may not be sold, transferred, pledged or hypothecated in the absence of an effective registration statement for such shares under the Securities Act of 1933, unless, in the opinion (which shall be in the form and substance satisfactory to the corporation) of counsel, such registration is not required.

After such endorsement, the certificates shall be returned to their respective owners who shall be entitled, subject to the terms hereof, to exercise all rights and interest therein. All SHARES of the capital stock of the CORPORATION hereafter issued shall bear the same endorsement described above. Upon the termination of this Agreement, such certificates shall be surrendered to the CORPORATION and new certificates, without the foregoing endorsement, shall be issued in lieu thereof.

## ARTICLE X
### SALE OF CORPORATE ASSETS

10.01     SALE OF CORPORATE ASSETS.   Should the CORPORATION receive an offer or make an offer (the original offer) for the purchase or sale of any of its assets, then and in that event, any SHAREHOLDER, within sixty (60) days from the receipt of written notice of such original offer, shall have the right to solicit, negotiate and secure a competing offer, (competing offer) which shall be bona fide, from any other person, provided that none of the SHAREHOLDERS are the competing offeror nor shall they be connected directly or indirectly with the competing offeror.

10.02  <u>ACCEPTANCE OF OFFER.</u>  Upon the receipt of any such bona fide competing offer or offers within the sixty (60) day period described above, the CORPORATION shall reject or accept the original offer, reject or accept the competing offer, or reject both or all of them, whichever is in the best interests of the CORPORATION.  Under no circumstances shall this provision be construed to mean that the CORPORATION must accept any offer, whether original or competing, it being the intention of the parties that the CORPORATION is under no obligation to sell its assets at any time.

10.03  <u>APPLICATION TO TRANSFEREES.</u>  The provisions of this Article X shall apply to the transferee of any SHARES, and any interest in such SHARES, including, by way of example and not by way of limitation, the donees, devisees, heirs, or personal representatives of the estate of any deceased SHAREHOLDER or the beneficiary of any SHARES, and any interest in such SHARES.

## ARTICLE XI
## EMPLOYMENT OF SHAREHOLDERS BY CORPORATION

11.01  <u>COMPENSATION.</u>  No SHAREHOLDER shall be entitled to any salary or other compensation for services rendered to or for the benefit of the CORPORATION unless a written agreement to that effect is signed by the CORPORATION and a majority of the SHAREHOLDERS.    Likewise,    out-of-pocket    expenses    shall    be reimbursed to or paid for the benefit of any SHAREHOLDER when such expenses and/or costs are incurred by such SHAREHOLDER in the furtherance of the CORPORATION'S business and approved in writing by the CORPORATION.

11.02  <u>DUTIES OF SAMUEL VELEZ, JR.</u>  SAMUEL VELEZ, JR. shall devote a reasonable amount of his time, attention, and talents to the rendition of services in behalf of the CORPORATION and to the furtherance of its best interests and shall use his best efforts, skills, and abilities in the performance of his services hereunder and in the promotion of the interests of the CORPORATION.

A.  <u>Specific Duties:</u>  SAMUEL VELEZ, JR. shall perform in behalf of the CORPORATION the following specific duties:
1.  Sit on the Board of Directors of the CORPORATION.

2.  Act as an officer of the CORPORATION in the specific capacity of President.

3.  Any duties reasonably assigned by the Board of Directors of the CORPORATION.

B.  <u>Compensation:</u>  SAMUEL VELEZ, JR. shall receive the following compensation for his services:

1.  $500.00 per week, as and for a Director's fee.

11

C.  CORPORATION Policies:  SAMUEL  VELEZ,  JR.
agrees that in the rendition of all services described in this
Section 11.02, he will comply with such reasonable policies,
standards, and regulations of the CORPORATION and applicable
governmental laws as are from time to time established.

11.03  DUTIES OF ANTHONY J. GARILLI.  ANTHONY  J.
GARILLI shall devote a reasonable amount of his time, attention,
and talents to the rendition of services in behalf of the
CORPORATION and to the furtherance of its best interests and
shall use his best efforts, skills, and abilities in the
performance of his services hereunder and in the promotion of the
interests of the CORPORATION.

A.  Specific Duties:  ANTHONY J. GARILLI shall
perform in behalf of the CORPORATION the following specific
duties:

1.  Sit on the Board of Directors of the CORPORATION.

2.  Act as an officer of the CORPORATION in the
specific capacity of Secretary/Treasurer.

3.  Any duties reasonably assigned by the Board of
Directors of the CORPORATION.

B.  Compensation:  ANTHONY  J.  GARILLI  shall
receive the following compensation for his services:

1.  $500.00 per week, as and for a Director's fee.

C.  CORPORATION Policies:  ANTHONY J. GARILLI
agrees that in the rendition of all services described in this
Section 11.03, he will comply with such reasonable policies,
standards, and regulations of the CORPORATION and applicable
governmental laws as are from time to time established.

11.04  DUTIES OF LOUIS BLAS.  LOUIS BLAS shall devote
a reasonable amount of time, attention, and talents to the
rendition of services in behalf of the CORPORATION and to the
furtherance of its best interests and shall use his best efforts,
skills, and abilities in the performance of his services
hereunder and in the promotion of the interests of the
CORPORATION.

A.  Specific Duties:  LOUIS BLAS shall perform in
behalf of the CORPORATION the following specific duties:

1.  Sit on the Board of Directors of the CORPORATION.

2.  Act as general manager of Gold's Gym and Fitness
Center, located at 1436 East Commercial Blvd., Fort Lauderdale,
Florida 33334.

12

3.   Act as an officer of the CORPORATION in the specific capacity of Vice-President.

4.   Any duties reasonably assigned by the Board of Directors of the CORPORATION.

B.   Compensation:   LOUIS BLAS shall receive the following compensation for his services:

1.   $500.00 per week, as and for a salary.

C.   CORPORATION Policies:   LOUIS BLAS agrees that in the rendition of all services described in this Section 11.04, he will comply with such reasonable policies, standards, and regulations of the CORPORATION and applicable governmental laws as are from time to time established.

11.05   DUTIES OF THOMAS GRIFFIN.   THOMAS GRIFFIN shall devote a reasonable amount of time, attention, and talents to the rendition of services in behalf of the CORPORATION and to the furtherance of its best interests and shall use his best efforts, skills, and abilities in the performance of his services hereunder and in the promotion of the interests of the CORPORATION.

A.   Specific Duties:   THOMAS GRIFFIN shall perform in behalf of the CORPORATION the following specific duties:

1.   Sit on the Board of Directors of the CORPORATION.

2.   Act as an officer of the CORPORATION in the specific capacity of Vice-President.

B.   Compensation:   THOMAS GRIFFIN shall receive the following compensation for his services:

1.   $500.00 per week, as and for a salary.

C.   CORPORATION Policies:   THOMAS GRIFFIN agrees that in the rendition of all services described in this Section 11.05, he will comply with such reasonable policies, standards, and regulations of the CORPORATION and applicable governmental laws as are from time to time established.

11.06   TERMINATION OF COMPENSATION:   The Board of Directors shall be and it is hereby empowered to terminate or reduce the compensation paid to any SHAREHOLDER, should it reasonably determined that any such SHAREHOLDER is not fulfilling his duties as herein assigned or hereafter assigned.

11.07   PRIVILEGE.   Each SHAREHOLDER hereby agrees that at all times, he will hold inviolate and keep secret all knowledge or information as to any matter relating to the business of the CORPORATION that came to the knowledge of the

13

SHAREHOLDER and that were made known to him by the CORPORATION or any of its directors, officers or employees, and that he will not impart or make known any of the same or anything relating to the same to any competitor or other person, firm or corporation, except when authorized so to do in writing, signed by the Board of Directors of the CORPORATION.

### ARTICLE XII
CONFLICT

No contract or other transaction between the CORPORATION and any other corporation or individual, shall, in the absence of fraud, be affected or invalidated by the fact that one of more of the SHAREHOLDERS of this CORPORATION is a party or parties to or interested in such contract, act or transaction, or in any way connected with such corporation, person or persons.

### ARTICLE XIII
AGENCY

No SHAREHOLDER shall have authority to enter into any contracts binding upon the CORPORATION, or to create any obligations on the part of the CORPORATION, except such as shall be specifically authorized by the Board of Directors of the CORPORATION or by an executive officer of the CORPORATION acting pursuant to authority granted by the Board of Directors.

### ARTICLE XIV
CORPORATION CHECKING ACCOUNT

The following named SHAREHOLDERS shall be empowered and authorized to sign all checks of the CORPORATION:

SAMUEL VELEZ, JR.          LOUIS A. BLAS
ANTHONY J. GARILLI         TOM GRIFFIN

and no others. Further, any check exceeding the amount of $3,000.00 shall require two (2) authorized signatures.

### ARTICLE XV
MONTHLY FINANCIAL STATEMENTS

The CORPORATION shall cause to be prepared and distributed to each SHAREHOLDER monthly financial statements which shall include a balance sheet and a profit and loss statement. At the option of the CORPORATION, such financial statements shall be prepared by the CORPORATION'S accountant or an employee of the CORPORATION.

### ARTICLE XVI
NOTICE

Any notice required hereunder shall be given in writing and shall be sent by registered or certified mail, return receipt

requested, or by personal delivery with a receipt acknowledging same, to the parties hereto at their last address appearing on the books of the CORPORATION.  Any notice required to be given hereunder to the estate of a deceased SHAREHOLDER shall be sent to its personal representative at his address, or, if no personal representative is appointed, to a deceased SHAREHOLDER at his last address designated on the books of the CORPORATION.

### ARTICLE XVII
### GOVERNING LAW AND CONSTRUCTION

17.01  GOVERNING LAW.  This Agreement shall be governed by the laws of the State of Florida.

17.02  CONSTRUCTION.  In the event any article, section, paragraph or subparagraph of this Agreement is found to be void, then the remaining articles, sections, paragraphs and subparagraphs shall, nevertheless, be binding with the same effect as though the void parts were deleted.  Wherever appropriate, the singular shall be deemed also to mean the plural and the male gender shall comprehend the female and/or neuter whenever the facts and circumstances permit such construction.

### ARTICLE XVIII
### AMENDMENT AND TERMINATION OF AGREEMENT

18.01  AMENDMENT, ALTERATION AND REVOCATION.  This Agreement may be amended, altered or revoked at any time or times, in whole or in part, only by a written agreement setting forth such changes, executed by the CORPORATION and all of its SHAREHOLDERS, and which shall be filed with the CORPORATION.

18.02  TERMINATION AS TO ALL PARTIES.  This Agreement shall terminate upon the occurrence of any one of the following events:

A.  The written agreement of the parties hereto or their successors in interest to that effect;

B.  The bankruptcy, receivership or dissolution of the CORPORATION;

C.  The death of all the SHAREHOLDERS simultaneously or within any period of ninety (90) days, in which case the termination shall be effective as of the day preceding the date of death of the first SHAREHOLDER to die; or

D.  If one SHAREHOLDER becomes the owner of all of the SHARES which are then subject to this Agreement.

18.03  TERMINATION AS TO SELLING OR DECEASED

SHAREHOLDER.  Upon compliance with this Agreement according to its terms, the disposal of all of the SHARES of any SHAREHOLDER during his lifetime shall terminate this Agreement as to such SHAREHOLDER or the sale of all of the SHARES of any SHAREHOLDER upon the death of such SHAREHOLDER shall terminate this Agreement as to such deceased SHAREHOLDER and his estate.

### ARTICLE XIX
### MISCELLANEOUS

19.01    ADDITIONAL  DOCUMENTS.    The   parties   hereto covenant   and   agree   that   they   and   their   heirs,   personal representatives,  devisees,  beneficiaries,  donees,  transferees, successors  and  assigns,  will  execute  any  and  all  instruments, releases, assignments and other documents and do all other things required  of  them  or  necessary  to  effectuate  the  purposes contemplated by this Agreement.

19.02    PERSONAL  REPRESENTATIVE.    The  term  "Personal Representative", for the purposes of this Agreement, shall mean and include any person or person empowered or entitled to act with respect to the property of a deceased SHAREHOLDER and shall include specifically, but not exclusively, where applicable, any of   the   following:   executors,   administrators,   conservators, guardians, beneficiaries or heirs.

19.03    ARTICLE  AND  SECTION  HEADINGS.    All  article, section, and paragraph headings contained in this Agreement are provided and intended for convenience of reference only and shall not be considered a part hereof for purposes of interpreting or applying this Agreement, and therefore, such article, section, or paragraph  headings  do  not  define,  limit,  extend,  explain, construe, or describe the scope or extent of this Agreement or any  of  its  terms,  provisions,  representations,  warranties, conditions, etc., in any manner or way whatsoever.

19.04    SEVERABILITY.    If   any   article,   section, paragraph, subparagraph or other provision of this Agreement, or the application of such article, section, paragraph, subparagraph or  provision  is  held  invalid,  then  the  remainder  of  this Agreement,  and  the  application  of  such  article,  section, paragraph, subparagraph or provision to persons or circumstances other than those with respect to which it is held invalid, shall not be effected thereby.

19.05    GENDER AND NUMBER.  All pronouns and variations thereof shall be deemed to refer to the masculine, feminine or neuter, and to the singular or plural, as the identity of the person or entity or persons or entities may require.

19.06    TIME.  Time is of the essence.

16

19.07  BINDING EFFECT.  Without intending to waive any provision hereinabove prohibiting the assignment or transfer of the rights contained herein, this Agreement shall be binding upon and inure to the benefit of, respectively, the parties, their successors, legal representatives, grantees and assigns, as applicable and appropriate, of all parties to this Agreement.

19.08  CONSTRUCTION.  This Agreement shall not be construed more strongly against any party regardless of who was more responsible for its preparation.

19.09  COUNTERPARTS.  This Agreement may be executed in any number of counterparts, each of which, when so executed and delivered, shall be an original, but each counterpart shall together constitute one and the same instrument.

19.10  FEES AND COSTS.  In the event it becomes necessary for any party herein to seek legal means to enforce the terms of this Agreement, the non-prevailing party will be liable for all reasonable attorneys' fees, travel expenses, deposition costs, expert witness expenses and fees, and any other costs of whatever nature reasonably and necessarily incurred by the prevailing party as a necessary incident to the prosecution or defense of such action, or in any post judgment or collection proceeding, plus court costs.  In the event it becomes necessary for any party to institute, defend, appear or attend any bankruptcy proceedings as a result of the filing of bankruptcy proceedings by or against the other party, all fees and expenses as delineated above incurred shall be borne by such party and shall become an additional amount due or a set-off against the amounts due under the terms of this Agreement.  If any party files bankruptcy proceedings or has bankruptcy proceedings filed against him, the other party shall be entitled to recover all attorneys' and expert witness expenses incurred in connection with any bankruptcy proceedings, hearing or trial.  In the event of a voluntary or involuntary dismissal by or against one party of any actions that have been commenced, the other party shall be deemed the prevailing party for the purposes of this section.

19.11  WAIVER.  Each of the parties to this Agreement reserve the right to waive any of the conditions precedent to any of the obligations imposed by this Agreement.  No waiver of any breach of this Agreement shall be held to be a waiver of any other or subsequent breach.  All remedies afforded in this Agreement shall be taken and construed as cumulative, that is, in addition to every other remedy provided herein or by law.  The failure of either party to enforce at any time any of the provisions of this Agreement, or to exercise any option which is herein provided, or to require at any time performance by the other party of any of the provisions hereof, shall in no way be construed to be a waiver or create an estoppel from enforcement of such provisions, nor in any way to affect the validity of this Agreement or any part thereof, or the right of either party to

17

thereafter enforce each and every such provision, or to seek relief as a result of the prior breach.

19.12 ENTIRE AGREEMENT. This Agreement contains the entire understanding of the parties and supersedes all previous verbal and written agreements; there are no other agreements, representations or warranties not otherwise set forth herein.

19.13 SURVIVAL. The executory provisions of this Agreement and all representations and warranties shall survive the consummation of the transactions contemplated by this Agreement.

19.14 VENUE. The parties hereto hereby voluntarily and knowingly waive any and all rights to a trial by jury and declare that venue shall be in Palm Beach County, Florida, in any action based hereon or arising hereunder.

19.15 FURTHER ASSURANCES. Whenever the CORPORATION or a SHAREHOLDER shall, pursuant to this Agreement, purchase shares of the Stock, each SHAREHOLDER and the personal representative of any deceased SHAREHOLDER shall do all things, and execute and deliver all papers, necessary to consummate the purchase. Each party agrees to perform any further acts and to execute and deliver any further documents that may be reasonably necessary to carry out the provisions of this Agreement.

19.16 NOTICES. Any and all notices, designations, consents, offers, acceptances, or any other communications provided for herein shall be given in writing by registered or certified mail, which shall be addressed, in the case of the CORPORATION, to its principal office and, in the case of any SHAREHOLDER, to the address appearing in the stock books of the CORPORATION or the SHAREHOLER's residence, or to such other address as may be designated by the SHAREHOLDER.

19.17 SPECIFIC PERFORMANCE. The parties hereby declare that it is impossible to measure in money the damages that will accrue to a party or to personal representatives of a deceased SHAREHOLDER by reason of a failure to perform any of the obligations under this Agreement. Therefore, if any party or the personal representative of a decedent shall institute any action or proceeding to enforce any provisions hereof, any person, including the CORPORATION, against whom such action or proceeding is brought, hereby waives a claim or defense that such party or such personal representative has an adequate remedy at law and shall not urge at such action or proceeding the claim or defense that such a remedy at law exists.

## ARTICLE XX
### INDEMNIFICATION

In addition to, and not as a waiver of any indemnification provisions as may be contained in the Articles of Incorporation of this CORPORATION, the SHAREHOLDERS hereto agree

18

they will each save, indemnify, contribute, hold harmless, and defend the other from all loss, liability, expenses, damages, costs and attorney's fees that they, or any of them, may at any time incur by reason of any actions or suits brought against them, or any of them, as a result of any action taken by each of them, or any of them, unless such action was taken in good faith and in furtherance of the CORPORATION'S business and which such action was known by the other.

ARTICLE XXI
DIVIDENDS

21.01  DIVIDENDS.  The amount of dividends and their date of payment shall be determined by the Board of Directors of the CORPORATION.

IN WITNESS WHEREOF, each SHAREHOLDER has hereunto set his hand and seal and the CORPORATION has caused its name to be signed and its seal to be affixed hereto by its President and Secretary, both duly authorized to do so by its Board of Directors, all as of the same day and year first above written.

Witnesses:

_____    _____
                                     SAMUEL VELEZ, JR.

_____    _____
                                     ANTHONY J. GARILLI

_____    _____
                                     LOUIS BLAS

_____    _____
                                     THOMAS GRIFFIN

_____    BACK TO BACK ENTERPRISES OF FLORIDA, INC.

                                     By: _____
                                                          , President

                                     Attest:

_____    By: _____
                                                          , Secretary

_____              CORPORATE SEAL

19

SCHEDULE B

SCHEDULE REFLECTING THE PURCHASE PRICE OF EACH SHARE OF STOCK OWNED BY THE SHAREHOLDERS OF BACK TO BACK ENTERPRISES, INC. AS REQUIRED BY THE FOREGOING AGREEMENT BETWEEN THE SHAREHOLDERS AND BACK TO BACK ENTERPRISES OF FLORIDA, INC., A FLORIDA CORPORATION.

| DATE OF REVALUATION | PURCHASE PRICE PER SHARE | INITIALS OF SHAREHOLDERS REFLECTING AGREEMENT AS TO PURCHASE PRICE PER SHARE |
|---|---|---|
| _____ | $_____ | _____/_____/_____ |
| _____ | $_____ | _____/_____/_____ |
| _____ | $_____ | _____/_____/_____ |
| _____ | $_____ | _____/_____/_____ |
| _____ | $_____ | _____/_____/_____ |
| _____ | $_____ | _____/_____/_____ |
| _____ | $_____ | _____/_____/_____ |
| _____ | $_____ | _____/_____/_____ |

Oct2

1                                         IN THE CIRCUIT COURT OF THE
                                          17TH JUDICIAL CIRCUIT IN AND
2            .                            FOR BROWARD COUNTY, FLORIDA

3                                         CASE NO: 95-16579 (11)

4    BACK TO BACK ENTERPRISES OF
     FLORIDA, INC., by and through
5    TOM GRIFFIN and LOUIS BLAS
     and THOMAS GRIFFIN, individually,
6
                   Plaintiff,
7
     vs.
8
     BACK TO BACK ENTERPRISES OF
9    FLORIDA, INC., ANTHONY J. GARILLI
     and SAMUEL VELEZ, JR.
10
                   Defendants.
11   _____/

12                                        519 S. Andrews Avenue
13                                        Fort Lauderdale, FL
                                          Tuesday, July 1, 1997
14                                        10:17 a.m.

15

16

17            VIDEOTAPE DEPOSITION OF THOMAS GRIFFIN

18

19

20            Taken before Kimberly Critelli, Shorthand

21   Reporter and Notary Public in and for the State of Florida

22   at Large, pursuant to Notice of Taking Deposition.

23

24

25                      - - - - - -

```
 1          after your first meeting with any I.R.S. agent?
 2                     MR. SAMILOW:  Objection.  Form.
 3                     THE WITNESS:  It was after the first meeting.
 4     BY MR. MARCUS:
 5          Q.   And at the first meeting, was there a
 6     conversation between you and the I.R.S. agent about you
 7     amending your tax return?
 8          A.   I think there was.
 9          Q.   Well, tell us again when the first meeting
10     with the I.R.S. agent was?
11          A.   I didn't meet Mr. Dunkel or Agent Dunkel
12     until I think July of '94.
13          Q.   We're going to come back to that meeting.
14               When you and Mr. Blas reviewed the 1993
15     corporate tax returns, did you think that there was
16     anything wrong with it?
17          A.   Yes.
18          Q.   What did you think was wrong with it?
19          A.   That there was unreported income.
20          Q.   Okay.
21               In what regard?
22          A.   What do you mean?  How much?
23          Q.   Yes?
24          A.   About $210,000 worth.
25          Q.   And how did you arrive at that figure?
```

24

```
 1                A.    I arrived at that through Mr. Blas.
 2                Q.    Okay.
 3                      Well, how did he arrive at that figure?
 4                A.    He was doing the accounting.  He was keeping
 5          the books.
 6                Q.    Okay.
 7                      What did he tell you?  What did Mr. Blas tell
 8          you as to how he was able to determine that there was
 9          $210,000 of unreported income?
10                A.    Like I said, he was keeping the books and he
11          knew what the accounts showed.  Plus he was dealing with
12          Joe Salinas.
13                Q.    What did he tell you specifically as to where
14          this money was unaccounted for?
15                A.    Cash receipts of about $110,000, which I
16          already knew of.
17                Q.    Well, when you say cash receipts of $110,000
18          which you already knew of, what are you talking about?
19                A.    The cash that we were taking from the
20          business.
21                Q.    What cash was this?
22                A.    Money that came into the business.  Daily
23          receipts.
24                Q.    And for how long a period of time had you
25          been taking cash from the business from daily receipts?
```

UNITED STATES of America, Plaintiff-Appellee,

v.

Salvador A. VIVIT, Defendant-Appellant.

No. 99-3773.

United States Court of Appeals,
Seventh Circuit.

Argued April 10, 2000

Decided June 6, 2000

Defendant was convicted in the United States District Court for the Northern District of Illinois, James B. Zagel, J., of mail fraud, and defendant appealed. The Court of Appeals, Kanne, Circuit Judge, held that: (1) sentencing court made reasonable approximation of loss caused by defendant's mail fraud scheme; (2) application to defendant of revised Sentencing Guidelines, which included enhancement for use of minors in commission of crime, did not violate ex post facto clause; (3) sentencing enhancement for use of minors was warranted; (4) sentence enhancement for reckless disregard to risk of serious injury was warranted; (5) defendant's patients were participants in defendant's scheme to defraud insurance companies; (6) sentence enhancement for leadership role was warranted; and (7) defendant occupied position of trust with insurance companies.

Affirmed.

Easterbrook, Circuit Judge, filed concurring opinion.

[1] CRIMINAL LAW ☜1139

110k1139
Definition of loss caused by defendant's mail fraud for purposes of sentencing is question of law, reviewed de novo. U.S.S.G. § 2F1.1(b)(1), 18 U.S.C.A.

[2] CRIMINAL LAW ☜1158(1)
110k1158(1)
Amount of loss caused by defendant's mail fraud as calculated by sentencing court is finding of fact, which Court of Appeals reviews for clear error; Court of Appeals will find clear error only when it is left with definite and firm conviction that mistake

has been made. U.S.S.G. § 2F1.1(b)(1), 18 U.S.C.A.

[3] POSTAL SERVICE ☜51
306k51
Amount of loss suffered by insurers from physician's mail fraud scheme would be calculated for sentencing purposes by netting total costs submitted by physician, minus legitimate medical services that he provided, where evidence demonstrated that physician performed some legitimate medical services for his patients. U.S.S.G. § 2F1.1(b)(1), 18 U.S.C.A.

[4] POSTAL SERVICE ☜51
306k51
Sentencing court made reasonable approximation of loss caused by physician's mail fraud scheme in which he submitted false claims to insurance companies which grossly overstated amount of care he provided, where court relied on cost of fraudulent services provided by physician and ratio of fraudulent to legitimate services provided to patients, as well as rates that physician charged for services. U.S.S.G. § 2F1.1(b)(1), 18 U.S.C.A.

[5] POSTAL SERVICE ☜51
306k51
Government bears burden of proof in demonstrating amount of loss caused by defendant's mail fraud, for sentencing purposes. U.S.S.G. § 2F1.1(b)(1), 18 U.S.C.A.

[6] CRIMINAL LAW ☜1312
110k1312
Sentencing court is not bound by Federal Rules of Evidence at sentencing and may take any information into account in passing sentence so long as it has sufficient indicia of reliability to support its probable accuracy.

[7] POSTAL SERVICE ☜51
306k51
Sentencing court did not clearly err in relying on evidence in record that was not supported by witness testimony when it calculated amount of loss caused by defendant's mail fraud. U.S.S.G. § 2F1.1(b)(1), 18 U.S.C.A.

[8] CRIMINAL LAW ☜1139
110k1139
Court of Appeals reviews de novo sentencing court's

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

interpretation of Sentencing Guideline provision enhancing sentence for use of minors in commission of offense and question of whether Ex Post Facto Clause was violated by such enhancement. U.S.C.A. Const. Art. 1, § 9, cl. 3; U.S.S.G. § 3B1.4, 18 U.S.C.A.

**[9] CRIMINAL LAW ☞1237**
110k1237

When defendant commits crimes that straddle date of promulgation of new guidelines provisions, defendant can be punished under guideline effective after beginning of straddle period. U.S.S.G. § 1B1.1 et seq., 18 U.S.C.A.

**[10] CONSTITUTIONAL LAW ☞203**
92k203

Statute increasing penalty for offense beginning before date of enactment, but continuing afterwards, does not offend ex post facto clause. U.S.C.A. Const. Art. 1, § 9, cl. 3.

**[11] CONSTITUTIONAL LAW ☞186**
92k186

Ex post facto clause was intended to check governmental power by restraining arbitrary and potentially vindictive legislation. U.S.C.A. Const. Art. 1, § 9, cl. 3.

**[12] CONSTITUTIONAL LAW ☞203**
92k203

Critical to relief under Ex Post Facto Clause is not individual's right to less punishment, but lack of fair notice and governmental restraint when legislature increases punishment beyond what was prescribed when crime was consummated. U.S.C.A. Const. Art. 1, § 9, cl. 3.

**[13] CONSTITUTIONAL LAW ☞203**
92k203

Sentencing Guidelines' grouping rules which were in effect at time that defendant committed mail fraud offenses gave defendant fair notice at time that offenses were consummated that commission of further crimes subjected to grouping would subject him to sentencing under version of Guidelines in effect when he committed the last of series of grouped offenses and, thus, application to defendant of revised Guidelines, which included enhancement for use of minors in commission of crime, did not violate ex post facto clause, even though defendant's offenses involving minors were completed before

enactment of revised Guidelines. U.S.C.A. Const. Art. 1, § 9, cl. 3; U.S.S.G. § 3B1.4, 18 U.S.C.A..

**[13] CRIMINAL LAW ☞1236**
110k1236

Sentencing Guidelines' grouping rules which were in effect at time that defendant committed mail fraud offenses gave defendant fair notice at time that offenses were consummated that commission of further crimes subjected to grouping would subject him to sentencing under version of Guidelines in effect when he committed the last of series of grouped offenses and, thus, application to defendant of revised Guidelines, which included enhancement for use of minors in commission of crime, did not violate ex post facto clause, even though defendant's offenses involving minors were completed before enactment of revised Guidelines. U.S.C.A. Const. Art. 1, § 9, cl. 3; U.S.S.G. § 3B1.4, 18 U.S.C.A..

**[14] CRIMINAL LAW ☞1254**
110k1254

Defendant "used minors in the commission of his crimes," thereby warranting sentencing enhancement, if his affirmative actions involved minors in his criminal activities. U.S.S.G. § 3B1.4, 18 U.S.C.A..

**[15] CRIMINAL LAW ☞1254**
110k1254

Physician "used minors in the commission of his" mail fraud offenses, thereby warranting sentencing enhancement, where physician directed minors to sign attendance sheet fraudulently to inflate number of their visits and submitted bills to minors' insurers misrepresenting number of visits made and types of services received. U.S.S.G. § 3B1.4, 18 U.S.C.A.

**[16] CRIMINAL LAW ☞1158(1)**
110k1158(1)

Sentencing court's determination that defendant's conduct posed a conscious or reckless risk of serious bodily injury to his patients is finding of fact, which is reviewed for clear error. U.S.S.G. § 2F1.1(b)(6)(A), 18 U.S.C.A.

**[17] CRIMINAL LAW ☞1139**
110k1139

To extent that Court of Appeals reviews whether sentencing enhancement is appropriate, Court faces question of law that it reviews de novo. U.S.S.G. § 1B1.1 et seq., 18 U.S.C.A.

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

--- F.3d ----

**Page 3**

**(Cite as: 2000 WL 722561 (7th Cir.(Ill.)))**

**[18] FRAUD** ☞69(1)
184k69(1)
In determining whether sentencing enhancement for reckless risk of serious bodily injury applies to fraud case, court is not concerned with whether actual injury occurred, but whether defendant's fraudulent course of conduct created risk that others would suffer serious bodily injury. U.S.S.G. § 2F1.1(b)(6)(A), 18 U.S.C.A.

**[19] FRAUD** ☞69(1)
184k69(1)
Risk of serious injury caused by physician's failure to supervise unlicensed individual performing ultrasound therapy and electric muscle stimulation and by his use of heat pads to bruised areas on patients was insufficient to support sentencing enhancement for fraud when offenses involve "conscious or reckless risk of serious bodily injury." U.S.S.G. § 1B1.1 et seq., 18 U.S.C.A.

**[20] POSTAL SERVICE** ☞51
306k51
Physician acted with reckless disregard to risk of serious bodily injury, thereby warranting sentencing enhancement for his mail fraud convictions, where physician failed to perform physical examinations on patients who visited him following automobile accidents and failed to perform certain basic diagnostic tests, such as taking blood pressure, on other patients who later proved to be at risk. U.S.S.G. § 1B1.1 et seq., 18 U.S.C.A.

**[21] CRIMINAL LAW** ☞1158(1)
110k1158(1)
Sentencing court's determination that defendant played leadership role in mail fraud scheme is finding of fact, which Court of Appeals reviews for clear error. U.S.S.G. § 3B1.1(a), 18 U.S.C.A.

**[22] CRIMINAL LAW** ☞1251
110k1251
To determine whether defendant is **organizer** or **leader,** for purposes of sentence enhancement, court considers defendant's exercise of decision-making authority, nature of his participation in committing crime, his recruitment of accomplices, his claimed right to larger share of criminal proceeds, extent of his participation in planning or organizing crime, nature and scope of illegal activity, and degree of control and authority exercised over others. U.S.S.G. § 3B1.1(a), 18 U.S.C.A.

**[23] CRIMINAL LAW** ☞1251
110k1251
Sentencing court properly identified five participants in mail fraud scheme on which court based sentencing enhancement for defendant's leadership role in scheme, where court adopted findings of fact in presentence report which isolated five individuals who were deemed to be participants. U.S.S.G. § 3B1.1(a), 18 U.S.C.A.

**[24] CRIMINAL LAW** ☞1251
110k1251
Physician's patients were participants in physician's mail fraud scheme to defraud insurance companies, for purposes of sentence enhancement for physician's leadership role, where patients admitted that they visited physician to create large medical bill to be used in their insurance claim, signed attendance sheet misrepresenting number and timing of their doctor visits, and signed false documents misrepresenting extent of treatment that they received. U.S.S.G. § 3B1.1(a), 18 U.S.C.A.

**[25] CRIMINAL LAW** ☞1251
110k1251
Sentence enhancement for physician's role as **leader** and **organizer** of scheme to defraud insurance companies was warranted, where evidence at trial demonstrated that physician was principal **organizer** of numerous fraudulent insurance claims, that he recruited patients to file false claims and that primary financial benefit from these activities accrued to him. U.S.S.G. § 3B1.1(a), 18 U.S.C.A.

**[26] CRIMINAL LAW** ☞1139
110k1139
Interpretation of term "position of trust" in Sentencing Guidelines is legal question that is reviewed de novo, but determination that defendant occupied position of trust is finding of fact, which Court of Appeals reviews only for clear error. U.S.S.G. § 3B1.3, 18 U.S.C.A.

**[26] CRIMINAL LAW** ☞1158(1)
110k1158(1)
Interpretation of term "position of trust" in Sentencing Guidelines is legal question that is reviewed de novo, but determination that defendant occupied position of trust is finding of fact, which Court of Appeals reviews only for clear error. U.S.S.G. § 3B1.3, 18 U.S.C.A.

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

--- F.3d ----
(Cite as: 2000 WL 722561 (7th Cir.(Ill.)))

[27] CRIMINAL LAW ☞1139
110k1139
Determination whether sentencing court has engaged in impermissible double counting under Sentencing Guidelines is question of law, which Court of Appeals reviews de novo.

[28] CRIMINAL LAW ☞1254
110k1254
Physician occupied position of trust with respect to private insurance companies which he defrauded, for purposes of imposing sentencing enhancement for abuse of position of trust, even though physician's relationship with those companies was commercial in nature. U.S.S.G. § 3B1.3, 18 U.S.C.A.

Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 98 CR 157 01--James B. Zagel, Judge.

Before EASTERBROOK, KANNE and ROVNER, Circuit Judges.

KANNE, Circuit Judge.

*1 A jury found Salvador Vivit, a medical doctor, guilty of sixteen counts of mail fraud based on a scheme in which he and his patients submitted false claims to insurance companies that grossly overstated the amount of care he had provided. The district court sentenced Vivit to seventy-two months imprisonment for these offenses. On appeal, Vivit does not contest the convictions, but he claims that the district court committed numerous errors in determining the appropriate sentence. Finding no errors in Vivit's sentence, we affirm the decision of the district court.

1. History

Salvador Vivit operated the Family Medical Center, a one-doctor clinic located in Elmwood Park, Illinois. At the Family Medical Center, Vivit employed only two other individuals, Estrella Del Moral, who worked as a receptionist, did filing and sometimes provided physical therapy to Vivit's patients, and Adriano "Andy" Apostol, his partner, who processed and filed insurance claims for Vivit.

Vivit and Apostol had founded the clinic together in 1993, with Apostol providing about $7,000 in start-up money and equipment. However, because Vivit was the only licensed doctor, he ran the clinic as a sole practitioner. Vivit recruited patients and

performed medical treatment, while Apostol processed and filed insurance claims for him and used the office as a base for other shady business ventures. In September 1994, Vivit and Apostol had a disagreement. Apostol then quit and removed many items from the clinic, including the clinic's computer, a television, a chair and 134 boxes of patient files documenting the clinic's accident victims. These patient files were given by Apostol to the Elmwood Park Police department, who investigated and eventually arrested Vivit. Shortly after removing this equipment from the clinic, Apostol departed for the Philippines, where he remains.

Between 1993 and 1996, Vivit involved as many as 130 patients in a complicated scheme to defraud insurance companies by charging for services that he did not provide. Vivit engaged in five principal types of fraudulent conduct: (1) billing insurers for patient visits that did not occur; (2) billing for physical therapy that was not performed; (3) creating false medical records and reports to submit to insurance companies; (4) allowing his unlicensed assistant, Del Moral, to perform physical therapy without Vivit's supervision while he charged for therapy performed by a licensed therapist; (5) ordering unnecessary allergy tests for patients with no allergy symptoms.

Based on the information in Vivit's files obtained from Apostol, interviews conducted with Vivit's patients and claims filed by Vivit or his patients to their insurers, the government obtained enough evidence to secure a four-count indictment in July 1998. In December 1998, a new grand jury returned a seventeen-count superseding indictment charging Vivit with devising and executing a scheme to defraud. The indictment alleged that Vivit engaged in fraudulent use of the mails on seventeen separate instances between 1993 and 1996, and the final count of the indictment claimed that one check was mailed in furtherance of the conspiracy as late as August 6, 1996. On June 29, 1999, the district court conducted a jury trial to consider the charges against Vivit.

At trial, the government produced the testimony of twenty-six former Vivit patients and entered into evidence false bills and medical reports created for forty-nine patients. Each of the testifying patients had in some way been involved in Vivit's scheme to defraud their insurers. Some, including Roy, Myla

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

--- F.3d ----
(Cite as: 2000 WL 722561, *1 (7th Cir.(Ill.)))

and Lauro Sansano, merely filled out false attendance sheets at Vivit's request. However, the Sansanos testified that they back-dated many of the signatures to conceal a considerable lapse of time between when the accident from which they claimed injuries occurred and their initial visit to Vivit, belying Vivit's claim that the attendance sheets were used to make future appointments. In addition, Roy Sansano testified that they visited Vivit because a friend told him that to receive a favorable insurance settlement, they should see Vivit, a doctor who would produce false medical documentation to support their claim.

*2 Other patients testified about more extensive fraudulent conduct. For example, Veronica Leighton testified that she received $53,000 as a result of filing a false disability insurance claim. Leighton, who pleaded guilty to tax evasion and mail fraud for her crimes, first submitted a false medical bill to her insurer based, in part, on twenty-nine fictitious visits to Vivit's clinic for which Vivit created a record. Leighton decided that she also should seek disability benefits, and she testified that Vivit told her how to prepare a fraudulent claim for her disability insurer. In conjunction with this fraud, Vivit filled out a certificate of disability swearing that in his medical opinion Leighton was disabled.

Many other patients testified that, in addition to overbilling by creating a false attendance record, Vivit exaggerated the amount of treatment that he performed. Vivit's records showed that he had performed ultrasound therapy on numerous patients in 1993, but the government produced the supplier of Vivit's ultrasound machine, who testified that the machine was not delivered until the spring of 1994. In addition, Vivit's files show that he performed an examination and two follow-up examinations on Sharlon Silvestre, but Silvestre testified that Vivit never examined him. Vivit also included a diagnosis of whiplash and migraines in his medical record, but Silvestre testified that he did not have headaches and that Vivit never informed him that he suffered from whiplash. Vivit's files also show that he performed therapy on Jennifer Cailles's back and neck. Cailles, who was sixteen at the time when she was treated by Vivit, testified that this therapy was never performed. In addition, many other patients added testimony to the record similar to that offered by Silvestre and Cailles.

Other patients testified that Vivit failed to provide

adequate medical services in the course of his care. Avelina De La Rosa testified that she had extremely high blood pressure following an automobile accident, but Vivit failed to test her blood pressure during the course of his diagnostic examination. Melandro Lubguban testified that he visited Vivit in pain following an automobile accident, but Vivit failed to examine him at all. Phina Garcia testified that she was covered with bruises when she visited Vivit, but Vivit did not examine her and instead approved hydro collator treatments for her, a treatment plan that medical experts advised against.

Del Moral also testified for the government, stating that she had performed "microphone" (ultrasound) therapy, hydro collator therapy and electrical muscle stimulation therapy on numerous patients without Vivit's supervision. She testified that the unsupervised therapy occurred largely because Vivit arrived at the clinic in the afternoon, and Del Moral performed one or two therapy sessions each morning. Although she lacked a license to perform physical therapy, she claimed that Vivit had trained her and that she was taking courses on therapy. Del Moral also testified that Vivit told her to make his patients falsify attendance sheets to inflate the amount of therapy they supposedly received. Del Moral testified that Vivit prepared patient bills, sometimes with the aid of Apostol, and gave them to her to file and mail.

*3 The government also presented the testimony of two experts, Drs. Daniel Samo and Gregory Mulford. Both doctors testified that the therapy that Vivit prescribed would be useless without an additional prescription of a course of exercise. They also testified that Vivit's failure to examine patients constituted a "hideous" dereliction of duty and that the prescription of hydro collator or electrical muscle stimulation therapy to patients with bruising was contraindicated. Finally, the doctors provided expert analysis about the amount which Vivit's fraudulent claims of treatment cost various insurers. Both experts testified that because all the treatment prescribed by Vivit was unnecessary, the entire amount of his bills should be considered fraudulent.

On the basis of this evidence, the jury returned a guilty verdict against Vivit on sixteen of the seventeen counts of the indictment. The district court sentenced Vivit in October 1999. Because it found that the convictions all involved substantially the same harm, the court chose to group all the

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

convictions, pursuant to United States Sentencing Guidelines § 3D1.2. The total offense level of the combined counts started at level six as directed by § 2F1.1(a), but the court increased the total offense level to thirteen because it found that the government had proved that, in aggregate, Vivit had defrauded insurers of between $120,000 and $200,000.

The government originally argued that Vivit had defrauded insurers of $265,618.80, of which about $60,000 should have been removed for legitimate pain and suffering of Vivit's patients. However, Vivit argued that the actual loss was much less because of the medical services that he provided. The parties argued extensively over the computation of loss, and the government, in support of its position, presented the court with a "Vivit loss chart" that listed all the costs associated with fraudulent billing by Vivit. This chart showed that Vivit had submitted bills containing fraudulent information valued at about $149,000, to which insurers paid out nearly $130,000, but the chart did not subtract the value of legitimate medical services performed by Vivit. The court found this chart persuasive and eventually attached the chart to its ultimate judgment. After listening to the parties' extended discussion on the calculation of amount of loss, the court concluded, "I think it is quite clear from the papers before me and from the trial and from the testimony, that a loss of at least $100,000 was proved. I am inclined to believe that more than $200,000 was proved, but relying on what I believe is most appropriate for this case, and that which cannot be questioned, I find that we have to add seven points rather than eight to the total offense level."

From a total offense level of thirteen, the court ultimately enhanced Vivit's total offense level to twenty-seven. The court initially raised the total offense level two levels pursuant to § 2F1.1(b)(6)(A) because the court found that Vivit's treatment recklessly placed his patients at serious risk of bodily injury. The court explained that "what [Vivit]'s position in this court is 'you know, I really didn't do very much. I used the most conservative treatment.' ... But the fact of the matter is that the most conservative treatment is not always best.... [H]e was, given his medical examination practices, a very lucky man that he did not miss something more serious, and for all we know maybe he did."

*4 The court enhanced four levels pursuant to § 3B1.1(a) for Vivit's role as an organizer or leader, basing its decision that Vivit led five other participants on the facts set out in the Pre-Sentencing Investigation and Report ("PSR"), and two additional levels because Vivit abused his position of trust relative to insurers, pursuant to § 3B1.3. In relation to the latter enhancement, the court noted that it enhanced Vivit's sentence not because of his use of a special skill, which the court felt would constitute double- counting in relation to its vulnerable victim enhancement, but because "it is fair to say that he counted upon that the insurance companies would extend trust to him, and certainly after a period of time doing this it is quite clear that he understood that they did trust him; so that he did abuse his trust relative to the insurance companies."

In addition, the court enhanced Vivit's sentence by two levels pursuant to § 3A1.1(b) because many of his patients constituted vulnerable victims and an additional two levels according to § 3B1.4 for using minors to commit an offense. Finally, the court enhanced two more levels because Vivit's scheme intended to defraud more than one victim, pursuant to § 2F1.1(b)(2). Adding all these enhancements, Vivit's total offense level reached twenty-seven. Because Vivit's criminal history category was I, this total offense level created a sentencing range of 70 to 87 months. The district court sentenced Vivit to 72 months imprisonment, followed by three years supervised release. Vivit also was ordered to pay $149,877 in restitution.

II. Analysis

On appeal, Vivit challenges his sentence on five grounds. First, Vivit claims that the district court erred in calculating the loss amount caused by his scheme. Second, Vivit finds error in the court's determination that he used minors in his scheme and in its application of this enhancement in light of potential ex post facto concerns. Third, Vivit claims that the court erred in determining that his treatment recklessly subjected his patients to a risk of serious bodily injury. Fourth, Vivit challenges the district court's attribution of a leadership role to him for his conduct in the scheme. Fifth, Vivit challenges the district court's enhancement to his sentence for abuse of a "position of trust" in relation to the insurance companies that he defrauded.

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

A. Calculation of Loss

**\*5** [1][2] At sentencing, the government and the probation office provided a "loss assessment" for the harm caused by Vivit as totalling $265,618.80. However, the district court found that the government was able to prove a loss of only $120,000 to $200,000. On this basis, the court enhanced Vivit's sentence seven levels, pursuant to United States Sentencing Guidelines § 2F1.1(b)(1)(H). On appeal, Vivit claims that the district court erred in its calculation of loss because the court failed to subtract the value of the legitimate medical services rendered from the loss incurred by the insurance companies and because the court's calculation of loss included evidence of fraud of which there was no testimony at trial or sentencing. The definition of loss is a question of law, reviewed de novo. See United States v. Holiusa, 13 F.3d 1043, 1045(7th Cir. 1994). The amount of loss calculated by the district court is a finding of fact, which we review for clear error. See United States v. Craig, 178 F.3d 891, 899 (7th Cir.1999). We find clear error only when we are "left with the definite and firm conviction that a mistake has been made." United States v. Strache, 202 F.3d 980, 984-85 (7th Cir.2000) (citation omitted).

Guidelines § 2F1.1(b)(1) directs sentencing courts to increase the defendant's total offense level according to the total amount of loss created by a defendant's actions, if that loss exceeds $2,000. U.S.S.G. § 2F1.1(b)(1). Application note 8 to § 2F1.1 indicates that the valuation of loss for the purposes of § 2F1.1 will be determined in the same fashion as for § 2B1.1 (theft). U.S.S.G. § 2F1.1 application note 8. Application note 2 to § 2B1.1 defines loss as "the value of property taken, damaged, or destroyed." U.S.S.G. § 2B1.1 application note 2. However, application note 8(a) to § 2F1.1 provides that when a fraud is committed by misrepresenting the value of an item that has some value, courts should value the loss at the amount by which the item was overvalued, that is, the difference between the represented value and the actual value. U.S.S.G. § 2F1.1 application note 8(a).

The valuation of loss "need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information." U.S.S.G. § 2F1.1 application note 9.

Guidelines § 2F1.1(b)(1) provides that courts should enhance the defendant's total offense level by at least eight points if a loss greater than $200,000 is proved, by only seven points if the total loss lies between $120,000 and $200,000, and by six or less points when the loss is less than $120,000. U.S.S.G. § 2F1.1(b)(1)(A)-(I). At sentencing, the parties engaged in an extended discussion about the proper valuation of loss to attribute to Vivit's scheme, in which the government claimed a loss valuation of greater than $200,000 and Vivit claimed a loss of less than $120,000. At the close of this discussion, the district court determined that "I think it is quite clear from the papers before me and from the trial and from the testimony, that a loss of at least $100,000 was proved. I am inclined to believe that more than $200,000 was proved, but relying on what I believe is most appropriate for this case, and that which cannot be questioned, I find that we have to add seven points rather than eight to the total offense level."

The parties disagree whether any of Vivit's services should be netted against the bills that he provided to insurers for his services. Vivit notes that we measure the amount of net detriment to the victim in calculating the amount of loss, rather than the total amount of money transferred. See United States v. Mount, 966 F.2d 262, 265 (7th Cir.1992). However, the government contends that none of the services performed by Vivit was medically necessary, and the great majority of the services billed were not even performed, making those services performed the type of action made only to give the appearance of legitimacy. In support of its contention, the government cites the case law of another circuit which provides that "if the 'value' to the victim is merely a part of the fraudulent scheme, the defendant is not entitled to a credit." United States v. Sayakhom, 186 F.3d 928, 947(9th Cir. 1999). However, the court in Sayakhom also noted that "in calculating loss, the district court should give credit for any legitimate services rendered to the victims." Id. at 946.

**\*6** [3] Application note 8(a) to § 2F1.1 reminds courts that in frauds where the item misrepresented has some value, the value of this item should be netted against the price offered to determine the amount of loss. While we have traditionally applied this netting theory in the fraudulent sale of goods, see United States v. Schneider, 930 F.2d 555, 558

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

(7th Cir.1991), we have also applied this theory to the fraudulent misrepresentation of other items of value, when some value has actually been transferred. See United States v. Jackson, 95 F.3d 500, 505-06 (7th Cir.1996). Despite the government's contention that the overwhelming majority of Vivit's billing was based on unperformed or unnecessary services, the evidence presented demonstrates that Vivit did perform some legitimate medical services. For this reason, we calculate the amount of loss suffered by the insurers by netting the total costs submitted by Vivit, minus the legitimate medical services that he provided.

However, we find no evidence in the record for Vivit's main contention on appeal, that the district court failed to perform this cost-netting in calculating the amount of loss caused by Vivit's fraud. The government urged the court to adopt an amount of loss that the government conservatively placed at greater than $200,000, based on the $265,000 paid out by insurers less the legitimate claims of Vivit's patients. The court felt that a loss greater than $200,000 had probably been proved but decided to sentence Vivit conservatively, finding that the government had not clearly established a loss of $200,000. As a benchmark, the court used the "Vivit loss chart," which calculated Vivit's fraudulent billing at approximately $150,000, of which insurers paid nearly $130,000. The court seems to have determined that the Vivit loss chart accurately reflected the amount of loss established by the government for the purpose of determining the § 2K1.1(b)(1) enhancement.

Unsatisfied by the court's decision, Vivit claims that the Vivit loss chart lacks any basis in fact, because the chart fails to net out the legitimate services provided by Vivit. However, Vivit fails to recognize that the chart was composed only of those bills in which fraudulent information was submitted. In addition to showing the total amount of loss, the chart shows the ratio of legitimate services provided to fraudulent services claimed, by showing for each bill what fraudulent activity Vivit had performed. The chart provides data on which to determine the amount of loss claimed, because it provides a basis from which to discount the value of legitimate services provided by Vivit from the fraudulent billing that he submitted. In addition, the court was provided with evidence about the amount Vivit charged for the performance of legitimate services.

*7 [4] Armed with an accurate cost of fraudulent services provided by Vivit and the ratio of fraudulent to legitimate services provided, as well as the rates that Vivit charged, we find that the district court made a reasonable approximation of the loss given the factual complexity of Vivit's scheme. Because the amount of loss need not be calculated with precision and because we believe that the loss chart and other facts in the record relied on by the district court to formulate a loss calculation support the amount of loss found by the district court, we find no clear error in the calculation of loss made by the district court.

[5][6][7] Vivit also argues that the district court's calculation of loss must be overturned because it is based on testimony of witnesses who did not testify at trial or at sentencing. While we appreciate that the government bears the burden of proof in demonstrating the amount of loss, see United States v. Bahhur, 200 F.3d 917, 924(6th Cir.2000), the sentencing court is not bound by the Federal Rules of Evidence at sentencing and "may take any information into account in passing sentence so long as it has sufficient indicia of reliability to support its probable accuracy." United States v. Carmack, 100 F.3d 1271, 1276 (7th Cir.1996). The information on which the district court based its loss calculation had been presented into evidence at trial without objection before the court considered it, and given the cumulative and reinforcing nature of this evidence, we find no clear error in determining that this evidence was supported by sufficient indicia of reliability in support of its accuracy, a finding that Vivit does not dispute. Additional testimony at sentencing is unnecessary to support a finding of reliability. See United States v. Morrison, 207 F.3d 962, 968 (7th Cir.2000). "A court can consider whatever evidence is before it in arriving at the amount of loss." United States v. Brown, 136 F.3d 1176, 1184 (7th Cir.1998). Therefore, we find no clear error in the district court's reliance on evidence in the record that was not supported by witness testimony in its calculation of loss amount.

B. Use of Minors

*8 [8] Next, Vivit contends that the district court committed error in increasing his total offense level by two points for using minors in the commission of his offenses, pursuant to U.S.S.G. § 3B1.4. Vivit argues that the court committed error in finding that

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

minors had in fact participated in Vivit's scheme. Vivit also argues that because all the fraudulent mailings involving minors were completed before the enactment of § 3B1.4, enhancement under this Guidelines section violates the Ex Post Facto Clause of the Constitution. We review de novo the district court's interpretation of § 3B1.4, see United States v. Brack, 188 F.3d 748, 765 (7th Cir.1999), and the question whether the Ex Post Facto Clause was violated by the enhancement pursuant to § 3B1.4.

### 1. Ex Post Facto Clause

Guidelines § 3B1.4, the "use of minors" enhancement, was enacted with an effective date November 1, 1995. U.S.S.G. § 3B1.4 historical note. Vivit admits that he filed false records for many minor patients, but he asserts that this conduct all occurred before November 1, 1995, and that application of the § 3B1.4 enhancement violates the Ex Post Facto Clause of the United States Constitution, U.S. Const. Art. I, § 9, because that clause generally prohibits the retroactive application of the Sentencing Guidelines if it results in a more onerous penalty. See United States v. Shorter, 54 F.3d 1248, 1261 (7th Cir.1995).

The one-book rule, the policy statement guiding the use of multiple guidelines, found in Guidelines § 1B1.11(b)(1), provides that "[t]he court shall use the Guidelines Manual in effect on the date that the defendant is sentenced." The one-book rule expresses the intent of the Sentencing Commission that the Guidelines reflect a cohesive whole and the Commission's resistance to application of various Guidelines in a piecemeal fashion. See United States v. Bousa, 997 F.2d 263, 266(7th Cir. 1992). When faced with the possibility of an ex post facto violation, the court is normally directed to "use the Guidelines Manual in effect on the date that the offense of conviction was committed." U.S.S.G. § 1B1.11(b)(1).

[9][10] However, the Guidelines also indicate that "[i]f the defendant is convicted of two offenses, the first committed before, and the second after, a revised edition of the Guidelines Manual became effective, the revised edition of the Guidelines Manual is to be applied to both offenses." U.S.S.G. § 1B1.11(b)(3). In this case, Vivit was convicted on count 17, the final count of his indictment for conduct that was committed in August 1996, well

after November 1, 1995. Therefore, on its face, § 1B1.11(b)(3) should apply, and absent ex post facto concerns we would find no error in the application of § 3B1.4. Vivit contests the application of § 1B1.11(b)(3) on two bases: (1) the only post-revision count, count 17, does not involve the use of a minor, so § 1B1.11(b)(3) is inapplicable; and (2) § 1B1.11(b)(3) violates the Ex Post Facto Clause. The former argument ignores the plain language of § 1B1.11(b)(3), which requires only that two crimes be committed on different dates, before and after the enactment of the Guidelines revision in question. The one-book rule does not require that both these crimes involve the same course of conduct, or that both involve conduct giving rise to the same sentencing enhancement. Therefore, it is immaterial whether the conduct predicate to Vivit's conviction on count 17 involved the use of a minor. However, if we find application of § 1B1.11(b)(3) violates the Ex Post Facto Clause, § 1B1.11(b)(1) requires that we instead apply the 1994 Sentencing Guidelines to all Vivit's convictions, which would preclude a § 3B1.4 enhancement. See United States v. Ortland, 109 F.3d 539, 547 (9th Cir.1997) (finding that mail fraud is not a continuing offense, so the defendant may properly be sentenced under multiple sets of guidelines); United States v. Bertoli, 40 F.3d 1384, 1404 (3d Cir.1994). But see United States v. Kimler, 167 F.3d 889, 893 (5th Cir.1999); United States v. Santopietro, 166 F.3d 88, 95-96 (2d Cir.1999). The settled law of this circuit is that when a defendant commits crimes that straddle the date of promulgation of new guidelines provisions, the defendant can be punished under a guideline effective after the beginning of the straddle period. See, e.g., United States v. Boyd, 208 F.3d 638, 648 (7th Cir.2000); United States v. Korando, 29 F.3d 1114, 1119-20 (7th Cir.1994). The rationale for this rule is that "a statute increasing the penalty for [an offense] beginning before the date of enactment but continuing afterwards does not offend the Constitution." United States v. Baresh, 790 F.2d 392, 404(5th Cir.1986).

The government contends that because the district court found the conduct committed by Vivit similar enough for § 3D1.2(d) grouping to apply, Vivit's actions constituted a continuing offense which straddled the promulgation of § 3B1.4, quieting any potential ex post facto concerns about the use of the 1995 Guidelines. However, the government's position is controversial. In United States v.

Ortland, 109 F.3d at 547, the Ninth Circuit found that because the predicate conduct constituting mail fraud was completed on mailing, a mail fraud scheme constituted a series of completed offenses, rather than a continuing course of conduct. On this basis, the court felt that applying the grouping rules and the one-book rule to a series of mail fraud crimes constituted a violation of the Ex Post Facto Clause on offenses completed before a revision of the Guidelines. See id.; see also Bertoli, 40 F.3d at 1404-07 (finding error in the district court's failure to analyze offenses independently for ex post facto problems). However, in United States v. Kimler, 167 F.3d at 895, the Fifth Circuit reached the opposite conclusion, relying on the Eleventh Circuit's reasoning in United States v. Bailey, 123 F.3d 1381, 1403-07 (11th Cir.1997), that the adoption of the one-book rule and the grouping rules put criminals on notice that "the version of the sentencing guidelines in effect at the time he committed the last of a series of grouped offenses will apply to the entire group," Kimler, 167 F.3d at 895, to determine that there was no ex post facto violation in using a revised guideline to sentence grouped mail fraud convictions. In that case, the court noted that although mail fraud offenses were completed offenses, rather than continuing offenses like conspiracies, because the grouping rules were in effect at the time a defendant committed acts of mail fraud, "a defendant has notice that if he continues to commit offenses that are grouped together, the revised guidelines will apply to the group." Id. at 894 n. 6; see also Bailey, 123 F.3d at 1406-07; United States v. Cooper, 35 F.3d 1248, 1252 (8th Cir.1994).

**\*9** In this circuit, the question whether to apply § 1B1.11(b)(3) depends on whether we perceive a defendant's course of conduct to straddle the enactment of revisions to the Sentencing Guidelines. See Boyd, 208 F.3d at 648-49. With continuing offenses, such as conspiracies, we have never questioned the applicability of ex post facto principles to this practice, because by agreeing to engage in a conspiracy, a defendant becomes culpable for all subsequent acts committed by the conspiracy. See Korando, 29 F.3d at 1119. However, we have held that mail fraud is a completed offense, implying that "the crime of mail fraud is completed, for sentencing purposes, at the time of the mailing. The actual duration of the scheme is of no import." United States v. Barger, 178 F.3d 844, 847(7th Cir. 1999). For this reason,

we have determined that mail fraud is not a straddle offense, in which case § 1B1.11 (b)(3) might not apply. See id. at 848.

However, in Barger, we were not confronted with a situation in which mail fraud convictions were grouped together according to § 3D1.2, because the criminal conduct committed in that case occurred before the enactment of the Guidelines. According to the rationale of the Eleventh Circuit in Bailey, the enactment of the grouping Guidelines places criminals on notice that committing additional criminal acts that are subject to grouping after a revision of the Guidelines makes all the defendant's conduct susceptible to the one-book rule. Bailey, 143 F.3d at 1406-07. On this basis, a series of mail fraud convictions that are grouped may be considered to straddle a revision without a presumptive ex post facto violation because of the criminal's prior notice of the grouping rules. Because the grouping rules were not available to provide notice when the defendants in Barger committed the predicate offenses that formed the basis for their convictions, we find that the result in Barger, that a series of mail fraud offenses do not straddle the enactment of the Guidelines, does not require us to conclude that applying a revised Guidelines Manual to a series of grouped mail fraud convictions constitutes an ex post facto violation.

**\*10** [11][12] By banning ex post facto application of new criminal laws, "the Framers sought to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." Weaver v. Graham, 450 U.S. 24, 28-29, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981); see also Miller v. Florida, 482 U.S. 423, 430, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987); Dobbert v. Florida, 432 U.S. 282, 293, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977). The clause was also intended to check governmental power "by restraining arbitrary and potentially vindictive legislation." Weaver, 450 U.S. at 29. "Critical to relief under the Ex Post Facto Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated." Id. at 30.

[13] Viewed in this context, the relevant inquiry becomes whether the grouping rules give the defendant fair notice at the time a crime is

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

consummated that the commission of further crimes subject to grouping would subject the defendant to sentencing under revised Guidelines. The grouping rules, enacted in 1987, provide warning to criminals that completing another criminal offense similar to one committed previously places them in peril of sentencing under a revised version of the Guidelines. The introductory commentary to the grouping rules explains that because the offense guideline for fraud, § 2F1.1, "deal[s] with repetitive or ongoing behavior," multiple fraud convictions are appropriately grouped when the convictions involve substantially the same harm. See U.S.S.G. § 3D introductory commentary. We believe that this conclusion reflects the intent of the Sentencing Commission to provide notice to criminals that engaging in ongoing fraudulent behavior involving the same type of harm risks grouping of convictions, which because of the one-book rule, will all be sentenced according to the Guidelines in effect when the latest conduct occurred.

For this reason, we believe that the enactment of the grouping rules provides fair notice such that the application of §§ 1B1.11(b)(3) and 3D1.2 does not violate the Ex Post Facto Clause. To violate the Ex Post Facto Clause, the application of amended Guidelines must disadvantage the defendant without providing the defendant with prior notice. See Miller, 482 U.S. at 430. Because the grouping rules provide such prior notice, we favor the position advanced by the Eighth Circuit in Cooper that "it was not the amendments to the Sentencing Guidelines that disadvantaged [the defendant], it was his election to continue his criminal activity." 35 F.3d at 1250.

*11 Vivit does not argue that his conduct did not involve "substantially the same harm," in which case the grouping rules should not have been applied. Nor does he provide any other reason that the enactment of the grouping rules should not be construed to place him on notice that the commission of further fraudulent mailings would subject him to sentencing under amended Guidelines. For this reason, we find no Ex Post Facto Clause violation in the district court's determination to apply the "use of minors" enhancement to all of the grouped offenses committed by Vivit.

2. Findings of Fact

Vivit also argues that the district court committed clear error in finding that minors participated in his scheme. Vivit was convicted on two counts in which the predicate conduct involved false insurance claims filed on behalf of a minor, and Vivit admits that he treated many minors in the course of his operation of the clinic. However, he contends that the role of the minor patients in his scheme was too minimal or unintentional for the finding that he used minors to commit the fraud offenses.

[14] Application note 1 to § 3B1.4 includes within the definition of use "directing, commanding, encouraging, intimidating, counseling, training, procuring, recruiting, or soliciting." In United States v. Benjamin, 116 F.3d 1204, 1206 (7th Cir.1997), we initially reviewed the "use" requirement of § 3B1.4 and found it met when the defendant took some affirmative action to involve a minor. See also United States v. Butler, 207 F.3d 839, 848(6th Cir.2000) ("[B]y deeming age relevant, Congress likely imagined an offender who actually exercised some control or took some affirmative role in involving the minor."). In United States v. Brack, 188 F.3d at 765, we found that the fact bases for an enhancement under § 3B1.4 had been met when the defendant performed affirmative acts to involve a minor in her crimes. Therefore, Vivit "used minors in the commission of his crimes" if his affirmative actions involved minors in his criminal activities.

[15] Vivit treated Jennifer Cailles for injuries suffered in an automobile accident. At that time, she was sixteen years old. As a part of the treatment, Vivit directed Cailles to sign the attendance sheet fraudulently to inflate the number of visits she paid Vivit. Vivit eventually submitted a bill to Cailles's insurer that showed forty-nine visits made, when Cailles actually made only eight or ten visits. Vivit also treated nine-year-old Laquita Barnett and her seven-year-old sister Johnetta Johnson for injuries suffered in an automobile accident. Laquita visited Vivit twice, and was given hot pad therapy. However, Vivit submitted a bill claiming that she had been given a comprehensive examination and had made two follow-up visits and twelve visits for therapy. Johnetta only visited Vivit once, but Vivit filed a bill with her insurer indicating twelve visits had occurred. Vivit directed both these girls to falsify an attendance sheet eleven times.

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

The facts presented about Jennifer Cailles, Laquita Barnett and Johnetta Johnson support the district court's finding that Vivit directed these minors to create a false attendance record. Therefore, Vivit's direction to falsify attendance records involved these minors in his crime and fell within the definition of "use" of minors contemplated by § 3B1.4.

C. Risk of Serious Bodily Injury

**\*12** [16][17] Vivit also challenges the district court's determination that the medical treatment Vivit provided, or failed to provide, placed some of his patients at risk of serious bodily injury, on which basis the court increased Vivit's total offense level two levels, according to U.S.S.G. § 2F1.1(b)(6)(A). Vivit claims that this finding of fact was clearly erroneous because it was based on speculation as to potential injury. The determination that Vivit's conduct posed a conscious or reckless risk of serious bodily injury to his patients is a finding of fact, and we review for clear error. See United States v. Turner, 102 F.3d 1350, 1357 (4th Cir.1996). However, to the extent that we review whether a sentencing enhancement is appropriate under this type of offense conduct, we face a question of law that we review de novo. See id.

Guidelines § 2F1.1(b)(6) directs courts to enhance a defendant's total offense level by two levels if the fraud perpetrated by the defendant involves "the conscious or reckless risk of serious bodily injury." U.S.S.G. § 2F1.1(b) (6)(A). "Serious bodily injury" is a phrase of general applicability used frequently throughout the Guidelines, and the phrase has been explained to mean "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." U.S.S.G. § 1B1.1 application note 1(j). Guidelines § 2F1.1 does not provide any insight into the type of conduct that should be considered reckless, but application note 1 to § 2A1.4 describes recklessness as "a situation in which the defendant was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation." U.S.S.G. § 2A1.4 application note 1 (involuntary manslaughter).

[18] On appeal, Vivit contends that because no patient was injured, any risk of serious injury was purely conjectural, and for this reason, the district court lacked any evidentiary basis on which to base its enhancement. See United States v. Greene, 71 F.3d 232, 236 (6th Cir.1995) (requiring district courts to base reckless risk enhancement on evidence of risk). Improper medical procedures, such as unnecessary surgery, performed for fraudulent purposes obviously may pose a risk of serious bodily injury. See, e.g., United States v. Laughlin, 26 F.3d 1523, 1531 (10th Cir.1994) (finding that unnecessary surgery creates a risk of serious bodily injury). However, as the Eighth Circuit noted in United States v. McCord, Inc., "for most frauds, risk of serious bodily injury is less direct and less obvious." McCord, 143 F.3d at 1098. In cases of fraud, where § 2F1.1(6)(A) applies, we are not concerned with whether actual injury occurred, but whether the defendant's fraudulent course of conduct created a risk that others would suffer serious bodily injury. In addition, Guidelines § 2F1.1(6)(A) demands that such a risk be undertaken recklessly. See id. Whether improper medical treatment may form the basis for an enhancement under § 2F1.1 (6)(A) is a question of first impression for this circuit.

The government provided three bases on which Vivit's sentence might have been enhanced: (1) his failure to supervise an unlicensed individual performing potentially dangerous physical therapy; (2) his direction to apply heat therapy to bruised areas, increasing the risk of injury; (3) his failure to examine physically certain patients he knew to have been injured in automobile accidents. The district court enhanced Vivit's sentence for reckless risk of serious bodily injury, but the court did not state directly on which of these theories it based the enhancement. The court did note its dissatisfaction with Vivit's diagnostic techniques by saying, "what [Vivit]'s position in this court is 'you know, I really didn't do very much. I used the most conservative treatment.'... But the fact of the matter is that the most conservative treatment is not always best.... [H]e was, given his medical examination practices, a very lucky man that he did not miss something more serious, and for all we know maybe he did."

**\*13** [19] Vivit contends that the government failed to prove either that Vivit ignored a known risk of serious injury or that any of the treatments that he

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

employed could have caused serious bodily injury. The rehabilitative techniques employed by Vivit, which included ultrasound therapy, electric muscle stimulation and using heat pads, are much less intrusive or inherently dangerous than surgical procedures. The experts provided by the government at trial testified that it was possible to cause injury using electric muscle stimulation if the electrodes used in the therapy are improperly applied or placed close to the heart. These experts also indicated that providing heat or ultrasound therapy to bruised areas was contraindicated. In addition, these experts also testified that these therapies provided no health benefits.

None of the government's twenty-six patient witnesses testified that electrical muscle stimulation was used in the chest area, and given the purpose of this therapy, we find the risk of injury from that type of treatment to be slight, even if the therapist who performed the therapy lacked a license. In addition, although applying heat to bruised areas may increase the internal bleeding from this bruising, this type of treatment does not rise to the level of "extreme physical pain or protracted function" required by the serious bodily injury standard. In fact, the risk of increased injury created by the treatments that Vivit actually performed or ordered performed seems quite slight, certainly too slight to justify an enhancement for reckless risk of serious bodily injury.

[20] The medical procedures that Vivit failed to perform raise more troubling questions. To conceal his ongoing fraud from insurers, Vivit engaged in rudimentary examination procedures better designed to generate additional visits in his attendance log than to diagnose injury. On multiple occasions, Vivit failed to perform physical examinations on patients who visited him following automobile accidents. In addition, Vivit failed to perform certain basic diagnostic tests, such as taking blood pressure, on certain patients such as Avelina De La Rosa who later proved to be at risk. While we do not believe that Vivit created a risk by failing to treat patients such as the Sansanos who visited him to inflate their own insurance settlements knowing that he would not provide adequate care, patients such as De La Rosa relied on Vivit's medical opinion and treatment to ensure that they had not suffered serious injury. By failing to examine such patients properly, Vivit created a risk that, had these patients suffered serious injuries, their injuries would remain

untreated. Moreover, by presenting evidence that certain of his patients were at risk of serious bodily injury without treatment, for example by virtue of their high blood pressure, the government has presented sufficient evidence to show that the risk here was actual, not conjectural. The facts also clearly demonstrate that Vivit acted recklessly in ignoring the risk that his failure to treat created. Therefore, we conclude that the district court did not err in enhancing Vivit's sentence under § 2F1.1(6)(A) for reckless risk of serious bodily injury.

D. Leadership Role

*14 [21] Vivit contends that the district court erred in increasing his total offense level four points based on his leadership role in the scheme. He argues that the record does not support such a finding of fact, and the court failed to make express findings as to which of his patients constituted members of the scheme for purposes of establishing a leadership role under U.S.S.G. § 3B1.1(a). The court's determination that Vivit played a leadership role in the scheme is a finding of fact, and we review for clear error. See United States v. Lewis, 79 F.3d 688, 690(7th Cir.1996).

[22] Guidelines § 3B1.1 directs the sentencing court to enhance a defendant's offense level four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). A "participant" is "a person who is criminally responsible for the commission of the offense." U.S.S.G. § 3B1.1 application note 1. To determine whether a defendant is an organizer or leader, we consider "the defendant's exercise of decision-making authority, the nature of his participation in committing the crime, his recruitment of accomplices, his claimed right to a larger share of the criminal proceeds, the extent of his participation in planning or organizing the crime, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." United States v. Sierra, 188 F.3d 798, 803-04 (7th Cir.1999); see also U.S.S.G. § 3B1.1 application note 4. These factors are not exhaustive, nor must all be present in order to enhance the defendant's sentence. See United States v. Mankiewicz, 122 F.3d 399, 406 (7th Cir.1997). Instead, we weigh these factors "in light of the

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

--- F.3d ----
(Cite as: 2000 WL 722561, *14 (7th Cir.(Ill.)))

Guidelines' intent to punish with greater severity leaders and organizers of criminal activity." *Sierra,* 188 F.3d at 804.

The district court adopted the statements in the PSR that Vivit's scheme involved at least five other participants: Estrella Del Moral, his receptionist; the Sansano family, Roy, Myla and Lauro; and Veronica Leighton. Even though four of these named participants were Vivit's patients, the district court felt that the four-level enhancement was especially appropriate because Vivit "in a moral sense and maybe in a legal sense, made criminals out of some of his patients." Vivit instructed Del Moral to create false records and order patients to file false claims and allowed her to perform therapy without a license, which he billed to insurers. Vivit taught Leighton how to obtain disability payments fraudulently and convinced her to create false records inflating her insurance claim. Vivit also instructed each of the Sansanos to create false medical records to inflate their insurance claims.

[23] The argument that the sentencing court failed to identify five participants on which to base the enhancement lacks merit. In this case, the district court adopted the findings of fact in the PSR, which isolated five individuals who were deemed to be participants, and a sentencing court may adopt the conclusions in the PSR as its own. See *United States v. Spears,* 965 F.2d 262, 273 (7th Cir.1992); *United States v. Musa,* 946 F.2d 1297, 1308 (7th Cir.1991). By adopting the conclusions of the PSR, the sentencing court adopted by reference the individuals isolated therein as participants.

Vivit's argument that those patients of his who were deemed participants lacked criminal intent proves equally unavailing. To count as a "participant" in Vivit's scheme, his patients must have been criminally responsible. See U.S.S.G. § 3B1.1 application note 1. This responsibility requires criminal intent, which belies these patients' status as victims. To this extent, Vivit raises a valid objection; none of those patients who were victimized by Vivit's poor treatment necessarily shared Vivit's criminal intent to defraud their insurers. However, Vivit treated more than 130 patients, and although many of these patients may have been innocent victims, some of these patients performed acts that suggest criminal responsibility.

*15 [24] Vivit does not contest that Del Moral and

Leighton were participants in his scheme. Instead, he focuses on the criminal responsibility of the Sansanos. Vivit presented each of the Sansanos with an attendance sheet and asked them to sign and date it, which they each did twenty-seven times. Vivit contends that this procedure was done to set up future appointments, and the Sansanos testified that they "pretty much followed instructions," in signing the sheets. However, the Sansanos back-dated many of these "appointments" to cover up the lapse of time between their automobile accident and their first consultation with Vivit. Roy Sansano also testified that his family visited Vivit because a friend told him that Vivit would create a large medical bill for him and his family to be used in their insurance claim.

[25] In reference to their claim, the Sansanos signed false documents misrepresenting the extent of treatment that they received from Vivit. The facts presented at Vivit's trial suggest that the Sansanos filed these documents intending to defraud their insurer. They also demonstrate that Vivit directed them on how to create a false record of treatment, and this false record of treatment constituted the basis on which the Sansanos filed false insurance claims. Therefore, the Sansanos were all participants in Vivit's scheme within the meaning of § 3B1.1. Considering Vivit's activities within the rubric of § 3B1.1, the evidence presented at trial demonstrates that he was the principal organizer of numerous fraudulent insurance claims, that he recruited patients to file these false claims and that the primary financial benefit from these activities accrued to him. For this reason, we find no error in the sentencing court's enhancement of Vivit's total offense level as a leader and organizer.

E. Position of Trust

[26][27] Finally, Vivit claims error in the district court's determination that Vivit abused his position of trust relative to the insurance companies he defrauded, on which basis the court increased his total offense level an additional two levels according to U.S.S.G. § 3B1.3. Vivit argues that he did not occupy a position of trust in relation to the insurance companies that he defrauded, and he contends that this enhancement actually constitutes impermissible double counting. Interpretation of the term "position of trust" is a legal question that we review de novo. See *United States v. Hathcoat,* 30 F.3d 913, 919

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

(7th Cir.1994). However, the determination that Vivit occupied a position of trust is a finding of fact, which we review only for clear error. See United States v. Boyle, 10 F.3d 485, 489 (7th Cir.1993). The determination whether a court has engaged in impermissible double counting is a question of law, which we review de novo. See United States v. Compton, 82 F.3d 179, 183 (7th Cir.1996) (citation omitted).

Guidelines § 3B1.3 requires courts to increase the total offense level of a defendant by two levels "[i]f the defendant abused a position of public or private trust ... in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. The district court felt that the insurance companies to whom Vivit submitted claims trusted the doctor, and increased accordingly on this ground. However, Vivit claims that because his relationship with these insurance companies was commercial rather than fiduciary, the enhancement is not applicable.

*16 [28] We recently disposed of this argument in United States v. Hoogenboom, 209 F.3d 665, 671(7th Cir. 2000), when we noted that "[m]edical service providers occupy positions of trust with respect to private or public insurers (such as Medicare) within the meaning of guideline § 3B1.3." Id. (citations omitted). We explained that "[m]edical providers ... enjoy significant discretion and consequently a lack of supervision in determining the type and quality of services that are necessary and appropriate for their patients. This forces [the insurer] to depend, to a significant extent, on a presumption of honesty when dealing with statements received from medical professionals." Id. Although in Hoogenboom, we were faced with fraud committed against a public insurer, Medicare, rather than against private insurers, we made no distinction between the two in determining whether the enhancement was applicable, and we believe that no distinction exists. For this reason, the facts presented by Vivit cannot be distinguished from those presented in Hoogenboom, and we find the logic in that case controlling.

Vivit also claims that enhancement under § 3B1.3 constitutes impermissible double counting, because it punished him for both acting as a leader and abusing a "special skill." Guidelines § 3B1.3 prohibits the enhancement under § 3B1.3 for use of a "special skill" in addition to enhancement under § 3B1.1 for a leadership role in the offense, but permits the enhancement for an "abuse of trust" in addition to a § 3B1.1 enhancement. U.S.S.G. § 3B1.3. The district court enhanced Vivit's sentence under both § § 3B1.1 and 3B1.3, but the court's articulated basis for the § 3B1.3 enhancement was that "it is fair to say that he counted upon that the insurance companies would extend trust to him, and certainly after a period of time doing this it is quite clear that he understood that they did trust him; so that he did abuse his trust relative to the insurance companies." Therefore, the court based its enhancement on "abuse of trust," not on "use of a special skill." There is no impermissible double counting to enhance under both §§ 3B1.1 and 3B1.3 in these circumstances.

III. Conclusion

For all the foregoing reasons, we find no error in the district court's computation of Vivit's sentence. Therefore, the decision of the district court is Affirmed.

EASTERBROOK, Circuit Judge, concurring.

*17 I join the court's opinion but add one thought. The gymnastics performed in Part II.B.1 to show that a two-level increase in Vivit's offense level is compatible with the ex post facto clause are unnecessary, because the sentencing guidelines are not "laws" within the scope of that clause. See United States v. Seacott, 15 F.3d 1380, 1391- 93 (7th Cir.1994) (concurring opinion); cf. Prater v. U.S. Parole Commission, 802 F.2d 948, 951-52 (7th Cir.1986) (en banc) (parole release guidelines are not "laws" for ex post facto purposes). Many cases say, and a few hold, that changes in the guidelines must be treated like changes in statutory punishments for purposes of the ex post facto clause, and the parties to this case accept that view, but these decisions are unconvincing. The only "law" at issue is the Sentencing Reform Act of 1984, enacted long before Vivit's crimes. Nothing that has occurred since Vivit committed his acts changed the definition of the offense, its maximum punishment, or the evidence that may be used to support conviction. See Carmell v. Texas, 68 U.S.L.W. 4325, 4328-29 (U.S. May 1, 2000). When open-ended discretion prevailed before the guidelines, no

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

--- F.3d ----
**(Cite as: 2000 WL 722561, \*17 (7th Cir.(Ill.)))**

one would have doubted that Presidents could appoint hard-nosed judges who handed out steep penalties, provided they did not exceed the statutory maximum at the time of the defendant's deeds. Large swings in effective punishment occurred because of changes in the composition of the bench and prevailing views about the seriousness of particular offenses.

What judges used to do without offending the ex post facto clause, the Sentencing Commission may do. The Sentencing Reform Act moves discretion from the individual judge to the Commission. Because the ex post facto clause does not apply to the judicial branch, see Marks v. United States, 430 U.S. 188, 191, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977), and the Commission is in the judicial branch, see Mistretta v. United States, 488 U.S. 361, 384-97, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989), the effective constraint is the due process clause, which requires judges to refrain from adopting startling interpretations of existing rules. E.g., Bouie v. Columbia, 378 U.S. 347 (1964); Prater, 802 F.2d at 952. Vivit does not contend that the increase in his sentence is so surprising that it violates the due process clause, and given the history of variability in sentencing practices over time (and across judges) such an argument would be untenable. "Changing the guidelines after the commission of a crime does not deprive the criminal of notice of the elements of the offense or the statutory limits of punishment. It may upset the expectations of the few would-be wrongdoers who study sentencing practices to determine their risks-- though even a small change in the probability of arrest or prosecution will have a much greater effect on the anticipated punishment than does a change in the guidelines, and no one believes that pouring extra resources into the detection and prosecution of crime violates the ex post facto or due process clause." Seacott, 15 F.3d at 1392-93. So although my colleagues faithfully implement the complex rules that have sprouted up to limit the damage caused by applying the ex post facto clause to a subject outside its proper domain, I would prefer a shorter path to affirmance. Congress has told courts to use the guidelines in force at the time of sentencing. 18 U.S.C. § 3553(a)(4). That command is constitutional, and I would follow it notwithstanding the United States Attorney's failure to defend (or even cite) the governing statute.

END OF DOCUMENT

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

# SLATTERY ASSOCIATES, INC.

**POLYGRAPH**





## FEDERAL & STATE COURT QUALIFIED

**Member**
**National Association of Polygraph Specialists**
**In Sex Offender Treatment / Monitoring**
**(NAPS)**

**GEORGE B. SLATTERY**
**American Polygraph Assoc.**
  Full Member / Lecturer
  Legal Committee Chairman
  Seminar Chairman
**National Polygraph Association**
**Academy of Certified**
  **Polygraphists**
  Distinguished Fellow
**National Polygraph Institute**
  Master of Polygraphy
  Senior Instructor
**Backster School of Lie Detection**
  Certificate of Completion
**Association of**
**Certified Fraud Examiners**
  Certified Fraud Examiner

**Florida Polygraph Assoc.**
  Certified Polygraphist #116
  Life Member
  Former:
    Board Chairman
    President
    Vice President
      Law Enforcement
      Private
    Board Member
    Seminar Chairman
    Lecturer
**American Association**
**of Police Polygraphists**
**American College**
**of Forensic Examiners**
  Board Certified Diplomate

REPORT OF POLYGRAPH EXAMINATION

OF

SAMUEL VELEZ

RE

TAX EVASION AND CONSPIRACY

COURT CASE NUMBER 00-6049

SLATTERY ASSOCIATES, INC. FILE NUMBER 00-0875(S)

EXAMINED ON

JULY 6TH, 2000

BY

GEORGE B. SLATTERY, CP, FPA, APA, NAPS
DIPLOMATE AND BOARD CERTIFIED FORENSIC EXAMINER, ABFE

REPORT DATE

JULY 8TH, 2000

8525 Northwest 53rd Terrace. Savannah Building, Suite 100. Miami, Florida 33166
Phone: (305) 592-7917 • Fax: (305) 591-5963
www.GeorgeSlattery.com • E-mail: TSCSAI@aol.com

SLATTERY ASSOCIATES, INC.                                    ii

## TABLE OF CONTENTS

I       QUALIFICATIONS OF THE EXAMINER . . . . . . . . . . . . . 1

II      EXAMINEE INFORMATION   . . . . . . . . . . . . . . . . . 2

III     PRETEST AND POST TEST RELEASES . . . . . . . . . . . . . 2

IV      POLYGRAPH INSTRUMENT INFORMATION . . . . . . . . . . . . 2

V       POLYGRAPH TECHNIQUE  . . . . . . . . . . . . . . . . . . 2

VI      QUESTION NUMBERING . . . . . . . . . . . . . . . . . . . 2

VII     BASIC CASE INFORMATION . . . . . . . . . . . . . . . . . 3

VIII    EXAMINEE'S VERSION OF THE INCIDENT  . . . . . . . . . . 4

IX      THE POLYGRAPH EXAMINATIONS . . . . . . . . . . . . . . . 5

X       RESULTS AND CONCLUSIONS  . . . . . . . . . . . . . . . . 6

CONFIDENTIAL  NO DISTRIBUTION OR DISSEMINATION OF THIS REPORT OR ANY PORTION THEREOF

**SLATTERY ASSOCIATES, INC.**

I

## QUALIFICATIONS OF THE EXAMINER

### GEORGE B. SLATTERY
(FPA Certified Polygraphist Number 116)

The examiner has been a practicing polygraphist since 1962, and has conducted approximately 15,000 polygraph examinations regarding criminal and civil issues, including major crimes testing for the Criminal Justice System. The examiner has qualified as an expert witness on numerous occasions in state and federal court, and was the polygraphist in United States v. Piccinonna [885 F2d 1539 (11th Cir. 1989)], United States v. Luis Rodriguez (United States District Court, Southern District of Florida, case number 98-0216-CR-Ungaro-Benages), United States v. Carlos Prieto, Otoniel Jesus Perez, et al (United States District Court, Miami Division, case number 96-565-CR-Nesbitt), United States v. Matthews (case number 94-6020-CR-Ungaro-Benages), State of Florida vs. Kassidy [495 So. 2d 907 (3rd. DCA 1986)], United States v. O'Neill (case number 93-8095-CR-Ungaro Benages), United States v. Duncan (case number 94-87-CR-ORL-22) United States v. Johnson, Cardoen, et al. (case number 93-241-CR-Highsmith), United States v. Johnie W. Osborne, et al. (Middle District of Florida, Tampa Division, case number 94-186-CR-T-24C), State of Florida vs. Jacques Georges (11th Cir. case number 95-24356), State of Florida v. Johnny Santiago [679 So.2d 861 (Fla.App. 4 Dist. 1996)], United States v. Robert Wohlleber (case number 95-139-CR-Highsmith), State of Florida v. Kenneth Krug (case number 96-010312-CFA10A), State of Florida v. Peter Walton (case number F93-12171), State of Florida v. Ricardo E. Rivera (case number F95-21217), United States Immigration re Alberto San Pedro (INA number A10 349 097-Eliza C. Klein), United States v. Daniel Boyar (United States District Court case number 96-35-CR-ORL-22), State of Florida v. Errol Barrett (Eleventh Judicial Circuit case no. F95-29429), United States v. Reine Duarte (United States District Court, Southern District of Florida, case number 97-0939-CR-King), and Mirta Ortega v. Omar Ortega (case number 95-14790FC17). Mr. Slattery also testified as an expert in the case of United States v. Shamico Peters, et al (United States District Court, Eastern District of Arkansas, case number LR-CR-98-63).

After receiving a Certificate Of Completion from The Backster School of Lie Detection, the examiner became a Life Member of The Florida Polygraph Association and served on the Board of Directors for 10 consecutive years; twice as President, three times as Chairman of The Board, and also served as Vice President Public Sector and Vice President Private Sector. The examiner has conducted numerous training seminars for that association on topics including: chart interpretation, numerical scoring of charts, ethics, control question formulation, the proper application of The Backster Zone Comparison Technique and the presentation of polygraph evidence in court. He has been designated as a Certified Polygraphist (CP) by the Florida Polygraph Association.

CONFIDENTIAL· NO DISTRIBUTION OR DISSEMINATION OF THIS REPORT OR ANY PORTION THEREOF

**SLATTERY ASSOCIATES, INC.**

QUALIFICATIONS OF THE EXAMINER (continued)

The examiner is a Full Member of the American Polygraph Association (APA), the Florida Polygraph Association (FPA), the National Polygraph Association (NPA), and the American Association of Police Polygraphists (AAPP). He has been designated as a Board Certified Forensic Examiner (BCFE) by the American Board of Forensic Examiners, a Certified Fraud Examiner (CFE) by the Association of Certified Fraud Examiners, a Certified Protection Professional (CPP) by the American Society For Industrial Security, and an Associate Member of the Association for the Treatment of Sexual Abusers (ATSA).

The examiner has attended and instructed at American Polygraph Association National Seminars between 1980 and 1994 in: Vancouver, British Columbia; Reno, Nevada; Atlanta, Georgia; Jeffersonville, Vermont; Orlando and Miami Beach, Florida; and Nashville, Tennessee. He has also served as Seminar Chairman, and presented to that association the documents he authored entitled "Effective Polygraph Utilization," "Polygraph Admissibility In Court," and "EPPA Polygraph Examinations."

Mr. Slattery has also been designated as a Distinguished Fellow of the Academy of Certified Polygraphists, and became a Senior Instructor at the National Polygraph Institute after receiving a Master of Polygraphy from that institute.

ADDITIONAL QUALIFICATIONS RELATIVE TO THE
CLINICAL POLYGRAPH EXAMINATIONS OF SEX OFFENDERS
ON PROBATION OR PAROLE

In addition to having examined numerous defendants, suspects, witnesses, and victims on sex related cases since 1962, Mr. Slattery is a member of the National Association of Polygraph Specialist in Sex Offender Testing/Monitoring (NAPS). He qualified for membership as the result of his education, training and experience, and having completed the 40 hour seminar sponsored by the Florida Department of Corrections and Florida Polygraph Association at the Criminal Justice Institute, St. Petersburg, Florida, from November 18th, through 22nd, 1996.

Mr. Slattery has also been awarded the certification of Advanced and Specialized Training by the Professional Development & Education Committee of the American Polygraph Association in the field of Sex Offender Clinical Examinations. He has also been designated Fellow of the College of the American College of Forensic Examiners.

Mr. Slattery has also attended various professional seminars relative to sex offender examinations including:

   The Florida Polygraph Association, Key West Seminar, from June 21st through 23rd, 1996, presented by Eric J. Holden, M.A.

CONFIDENTIAL: NO DISTRIBUTION OR DISSEMINATION OF THIS REPORT OR ANY PORTION THEREOF

**SLATTERY ASSOCIATES, INC.**

QUALIFICATIONS OF THE EXAMINER (continued)

On July 28th, 1997, at the request of Palm Beach County State Attorney Barry E. Krischer, Mr. Slattery and Mr. Steve Criss of Department of Corrections presented the basics of the clinical examinations to the State Attorneys of all Judicial Districts of the State of Florida, at the annual meeting in Key West, Florida.

The Florida Polygraph Association, Fort Meyers Seminar, from June 19th through 21st, 1998, presented by Scott Manners of the U.S. Department of Defense Polygraph Institute.

The Florida Department of Corrections Course of Instruction, on October 7th, 1998, presented by Probation Specialist Steve Criss of Region V, in Fort Meyers, Florida.

At the request of the Florida Department of Corrections, lectured in Oakland Park, Florida, on November 18th, 1998; Miami, Florida, on December 17th, 1998; Marathon, Florida, on January 13th, 1999, and West Palm Beach, Florida, on April 14th, 1999, on the Clinical Polygraph Examination of Sex Offenders.

Additional qualifications, references, or a Curriculum Vitae will be provided upon request.

CONFIDENTIAL  NO DISTRIBUTION OR DISSEMINATION OF THIS REPORT OR ANY PORTION THEREOF

**SLATTERY ASSOCIATES, INC.**    II

## EXAMINEE INFORMATION

Examinee information including full name, and stated aliases, nicknames, birth data, residence address, physical description, basic medical or psychological history, education, and employment data are retained in the Slattery Associates, Inc. files and copies of same can be made available to the examination sponsor upon request. If the Examinee has no positive photo identification at the time of the examination, a Polaroid photo is taken and retained in our file.

### III

## PRE-TEST AND POST TEST RELEASES

Each Examinee is requested to read and sign these releases confirming the voluntary nature of the examination. A Miranda Rights Warning is also utilized for stipulated examinations and for examinations conducted on behalf of any law enforcement agency or State Attorney's Office. These forms are retained in our case files and copies of the same are available upon the sponsor's request.

### IV

## POLYGRAPH INSTRUMENT INFORMATION

The instrument used for the examination was manufactured by the Stoelting Company and utilizes at least four pens for simultaneous, permanent, visual recordings of the Examinee's relative blood pressure, pulse, respiration, and galvanic skin reflex.

### V

## POLYGRAPH TECHNIQUE

The BACKSTER ZONE COMPARISON TECHNIQUE was utilized for the examination. The relevant test questions, only, and the Examinee's responses are listed in Section IX of this report.

### VI

## QUESTION NUMBERING

Test questions are numbered in accordance with the Backster Zone Comparison Technique. The total number of questions asked during the instrumentation phase of the examination range from 10 to 14, but are not listed in that usual order. For example, in the exploratory series, the relevant questions are numbered 39, 43, 44, and 45. This does not reflect that a total of 45 questions have been asked. This numbering system was established for the sake of standardization and to allow the blind numerical scoring of charts relative to quality control.

CONFIDENTIAL NO DISTRIBUTION OR DISSEMINATION OF THIS REPORT OR ANY PORTION THEREOF

**SLATTERY ASSOCIATES, INC.**

## VII

### BASIC CASE INFORMATION

Case information for the polygraph examination of SAMUEL VELEZ, age 51, was provided by MARC S. NURIC, Esquire. Sources of information included a two page Memorandum from Mr. Nuric, dated July 6th, 2000, and a copy of the 11 page Indictment, United States of American vs SAMUEL VELEZ, ANTHONY GARILLI, AND JOSEPH SALINA, Court case number 00-6049.

According to Mr. Nuric, Mr. Velez is currently under Indictment on charges of Tax Invasion and Conspiracy to Commit Tax Offenses. It is reported that Mr. Velez is allegedly the leader of this conspiracy, in as much as Mr. Velez directed or caused others to do certain things and commit tax offenses.

Mr. Velez has denied being a leader or conspirator as charged, and it was requested that this examiner attempt to confirm or negate his relevant statements, via the polygraph technique.

CONFIDENTIAL· NO DISTRIBUTION OR DISSEMINATION OF THIS REPORT OR ANY PORTION THEREOF

**SLATTERY ASSOCIATES, INC.**

### VIII

#### EXAMINEE'S VERSION OF THE INCIDENT

During the pretest interview SAMUEL VELEZ denied being the leader in the tax evasion conspiracy.

Mr. Velez said that in or about March of 1993, four individuals agreed to operate a health club business, known as "Gold's Gym." He said that each individual had a percentage in the corporation, known as Back To Back, Enterprises Inc. of Florida. Mr. Velez said that he owned 30 percent and was President, TONY GARILLI owned 30 percent and was a Vice President. He also said that TOM GRIFFIN owned 20 percent and was a Vice President. He added that LUIS BLAS owned 20 percent and was Secretary. Mr. Velez advised that his relations with these individuals were long term. He said that he has known Mr. Blas for over twenty years. Mr. Velez added that he worked with Mr. Griffin at the New York Police Department for approximately five years. He added that Mr. Garilli was his partner in another health club, again adding that they all have history together.

Mr. Velez said that around April or May of 1994, Mr. Blas and Mr. Garilli were paying themselves $500.00 cash per week for 40 hours of work during the build up phase of Back To Back (the Fort Lauderdale Golds Gym) and that went on for several months. He also said that memberships at a discounted rate were collected in abundance, and that Blas handled membership promotions, and Blas told him of his draw of $500.00 cash per week. He said that he and Mr. Griffin were not actively involved, so they did not get paid. He added that Blas told him that he and Griffin would also be getting cash draws of $500.00 per week. He said that once the club opened, they all decided as a group to pay themselves $500.00 cash each per week.

Mr. Velez also said that when Blas and Garilli were paid during the build out phase of the Gold Gym in issue, they did not report any of those cash payments on their personal returns. He added that this method of payments was already established, even before Mr. Griffin and Mr. Velez started to collect a salary. He stated that he never, ever suggested to the other share holders that they collect their salary this way, but added that they all felt they could trust each other. Mr. Velez said that Garilli and Blas had no other income at the time, other than the cash they took. Mr. Velez further added that there must have been a paper trail, as to the diversions of cash by Garilli and Blas.

CONFIDENTIAL  NO DISTRIBUTION OR DISSEMINATION OF THIS REPORT OR ANY PORTION THEREOF

**SLATTERY ASSOCIATES, INC.**

IX

THE POLYGRAPH EXAMINATIONS

The following relevant examination questions were asked of SAMUEL VELEZ, and his responses to those questions are also listed below:

## CHART I

39. Regarding your indictment for tax invasion and conspiracy to commit tax offenses; do you intend to answer truthfully each question about that?

(A) Yes.

42. Were you in any way the leader in that conspiracy to conceal or divert cash from Back To Back Enterprises?

(A) No.

43. Did you direct anyone to divert cash from Back To Back Enterprises?

(A) No.

44. Did you direct anyone not to record cash entries in the books of Back To Back Enterprises?

(A) No.

45. Did you initiate the idea or plan to divert cash from Back To Back Enterprises?

(A) No.

## CHART II

The same relevant questions were asked and the Examinee's responses were the same as those in Chart I, except that the order of the questions was reversed.

## CHART III

The same relevant questions were asked and the Examinee's responses were the same as those in Chart I.

CONFIDENTIAL· NO DISTRIBUTION OR DISSEMINATION OF THIS REPORT OR ANY PORTION THEREOF

X

RESULTS AND CONCLUSIONS

Based upon a careful analysis of SAMUEL VELEZ' polygrams, it was the opinion of this examiner that there were no significant or consistent psycho-physiological reactions consistent with deception to the relevant questions and answers.

Therefore, it was the opinion of this examiner that Mr. Velez did truthfully answer those questions.

CONFIDENTIAL  NO DISTRIBUTION OR DISSEMINATION OF THIS REPORT OR ANY PORTION THEREOF

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. 00-6049-CR-DIMITROULEAS

UNITED STATES OF AMERICA,

       Plaintiff,

v.

SAMUEL VELEZ, JR.,

       Defendant.       /     **PLEA AGREEMENT**

The United States of America and Samuel Velez, Jr. (hereinafter referred to as the "defendant"), enter into the following agreement:

1.    The defendant agrees to plead guilty to Count One of the Indictment, which count charges the defendant with knowingly and willfully conspiring to defraud the United States by impeding and impairing the Internal Revenue Service, U.S. Department of the Treasury, in the ascertainment, computation, assessment and collection of income taxes, in violation of Title 18, United States Code, Section 371.

2.    The United States agrees to dismiss Counts Two, Three, Four, Six and Seven of the Indictment at the time of sentencing.

3.    The defendant is aware that the sentence will be imposed in conformity with the Federal Sentencing Guidelines and Policy Statements (hereinafter "Sentencing Guidelines"), and that the applicable guidelines will be determined by the court relying in

part on the results of a Pre-Sentence Investigation by the court's probation office, which investigation will commence after the guilty plea has been entered. The defendant is also aware that, under certain circumstances, the court may depart from the applicable guideline range and impose a sentence that is either more severe or less severe than the guideline range. Knowing these facts, the defendant understands and acknowledges that the court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offense identified in paragraph 1 and that the defendant may not withdraw the plea solely as a result of the sentence imposed.

4.    .The United States agrees that it will recommend at sentencing that the court reduce the sentencing guideline level applicable to the defendant's offense, pursuant to Section 3E1.1 of the Sentencing Guidelines, based upon the defendant's recognition and affirmative and timely acceptance of personal responsibility. The United States further agrees to recommend that the defendant be sentenced at the low-end of the guideline range determined by the court. However, the United States will not be required to make these sentencing recommendations if the defendant: (1) fails or refuses to make a full, accurate and complete disclosure to the probation office of the circumstances surrounding the relevant offense conduct; (2) is found to have misrepresented facts to the government during plea discussions prior to entering this plea

-2-

agreement; or (3) commits any misconduct after entering into this plea agreement, including but not limited to committing a state or federal offense, violating any term of release, or making a false statement or misrepresentation to any governmental entity or official.

5.    The United States reserves the right to inform the court and the probation office of all facts pertinent to the sentencing process, including all relevant information concerning the defendant and his background.

6.    The United States and the defendant understand and agree that the court may impose any sentence authorized by law and that the defendant may not withdraw his plea solely as a result of sentence imposed.  The defendant understands and agrees that if the court does not follow the recommendation of the United States under Paragraph 4 the court may impose a statutory maximum term of imprisonment of up to 5 years, followed by a term of supervised release, for Count One of the Indictment.  In addition to a term of imprisonment and supervised release, the court may impose a fine of up to $250,000 on Count One of the Indictment.

7.    The defendant further understands and agrees that, in addition to any sentence imposed under paragraph 6 of this agreement, a special assessment in the amount of $100 will be imposed on the defendant payable at the time of sentencing.

8.    The defendant is aware that the sentence has not yet been

-3-

determined by the court.    The defendant is also aware that any estimate of the probable sentencing range that he may receive, whether the estimate comes from the defendant's attorney, the government, or the probation office, is a prediction, not a promise, and is not binding on the government, the probation office or the court.    The defendant understands further that any recommendation that the government makes to the court as to sentencing, whether pursuant to this agreement or otherwise, is not binding on the court and the court may disregard the recommendation in its entirety.    The defendant understands and acknowledges, as previously acknowledged in paragraph 3 above, that he may not withdraw his plea based upon the court's decision not to accept a sentencing recommendation made by the defendant, the government, or a recommendation jointly made by both the defendant and the government.

9.    The defendant is aware that Title 18, United States Code, Section 3742 affords the defendant the right to appeal the sentence imposed in this case.    Acknowledging this, in exchange for the undertakings made by the United States in this plea agreement, the defendant hereby waives all rights conferred by Title 18, United States Code, Section 3742 to appeal any sentence imposed, including any restitution order, or to appeal the manner in which the sentence was imposed, unless the sentence exceeds the maximum permitted by statute and/or is the result of an upward departure

-4-

from the guideline range the court establishes at sentencing.   The

defendant further understands that nothing in this agreement shall

affect the government's right and/or duty to appeal as set forth in

18 U.S.C. § 3742(b).   However, if the United States appeals the

defendant's sentence pursuant to Section 3742(b), the defendant

shall be released from the above waiver of appellate rights.   The

defendant understands that, although the defendant will be

sentenced in conformity with the Sentencing Guidelines, by this

agreement the defendant waives the right to appeal the sentence on

the basis that the sentence is the result of an incorrect

application of the Sentencing Guidelines.

    10.   The United States and the defendant agree that, although

not binding on the probation office or the court, they will jointly

recommend that the court make the following findings and

conclusions as to the sentence to be imposed:

> a.   <u>Loss</u>: That the relevant amount of actual, probable
> or intended loss under Section 2T4.1 of the
> Sentencing Guidelines resulting from the offense
> committed in this case is approximately
> $72,021.00.
>
> b.   <u>Sophisticated Means</u>: That sophisticated means were
> not used to impede the discovery of the existence
> or the extent of the offense under Section
> 2T1.1(b)(2).
>
> c.   <u>Aggravating Role</u>: That the government will not
> argue that the defendant is subject to a four-level
> upward adjustment pursuant to Section 3B1.1.
> However, the government reserves the right to argue
> that the defendant was an organizer, leader,
> manager, or supervisor of the offense committed and
> thereby subject to a two-level upward adjustment

under Section 3B1.1(c).

d.    Voluntary Surrender: That the government will not oppose a request by the defendant to voluntarily surrender to the Bureau of Prisons.

11.    The Office of the United States Attorney for the Southern District of Florida (hereinafter "Office") reserves the right to inform the court and the probation office of all facts pertinent to the sentencing process, including all relevant information concerning the offense committed, whether charged or not, as well as concerning the defendant and the defendant's background. Subject only to the express terms of any agreed-upon sentencing recommendations contained in this agreement.

12.    The defendant is aware that the sentence has not yet been determined by the court.    The defendant also is aware that any estimate of the probable sentencing range or sentence that the defendant may receive, whether that estimate comes from the defendant's attorney, the government, or the probation office, is a prediction, not a promise, and is not binding on the government, the probation office or the court. The defendant understands further that any recommendation that the government makes to the court as to sentencing, whether pursuant to this agreement or otherwise, is not binding on the court and the court may disregard the recommendation in its entirety. The defendant understands and acknowledges, as previously acknowledged in paragraph 9 above, that he may not withdraw his plea based upon the court's decision not to

-6-

accept a sentencing recommendation made by the defendant, the government, or a recommendation jointly made by both the defendant and the government.

13. The defendant agrees to cooperate with the Internal Revenue Service ("IRS") with respect to his individual income tax liabilities for 1993 and 1994 as well as the 1993 corporate tax liability for Valencia Fitness, Inc. In that regard, defendant agrees to stipulate to the income tax liability totalling approximately $72,021 for the years in question as set forth in the Revenue Agent's Report prepared by IRS Revenue Agent Ralph Rovirosa prior to sentencing.

14. The government will not oppose any request made by the defendant to the court and/or the Bureau of Prisons to obtain a furlough for personal family matters.

15. This is the entire agreement and understanding between the United States and the defendant. There are no other

-7-

agreements, promises, representations, or understandings.

Respectfully submitted,

GUY A. LEWIS
UNITED STATES ATTORNEY

Date: 7/10/00          By: _____
GREGORY E. TORTELLA
SPECIAL ATTORNEY
U.S. DEPARTMENT OF JUSTICE

Date: 7/10/00          _____
THEODORE M. DOOLITTLE
SPECIAL ATTORNEY
U.S. DEPARTMENT OF JUSTICE

Date: 7/10/00          _____
MARC S. NURIK, ESQUIRE
ATTORNEY FOR DEFENDANT

Date: 7/10/00          _____
MICHAEL S. POPOK, ESQUIRE
ATTORNEY FOR DEFENDANT

Date: 7-10-00          _____
SAMUEL VELEZ, JR.
DEFENDANT

-8-

  

U.S. Department of Justice

**Tax Division**

*Southern Criminal Enforcement Section*
*P.O. Box 972, Ben Franklin Station*          *(202) 514-5145*
*Washington, D.C. 20044*                        *Telefax: (202) 514-0961*

5-18-21605
1999229139

March 23, 2000

Marc Nurick, Esquire
Michael Popok, Esquire
Ruden, McClosky, Smith, Schuster & Russell
200 E. Broward Boulevard, 15th Floor
Fort Lauderdale, Florida 33301

> Re:    United States v. Samuel Velez, Jr.
>          Case Number 00-6049-Cr-Dimitrouleas

Dear Messrs. Nurick and Popok:

The purpose of this letter is to lay out the proposed terms of the government's plea offer in the above-referenced criminal case. In accordance with the Tax Division's major count policy, Mr. Velez must plead guilty to Count One in the Indictment.

For sentencing purposes, the government has computed a tax loss of over $70,000, but less than $120,000. The tax loss includes the relevant conduct of filing a false corporate return for Valencia Fitness, Inc., for 1993, filing false corporate returns for Back to Back Enterprises, Inc., for 1993 and 1994, and filing false individual returns for 1993 and 1994. In addition, a two-level increase would be appropriate under §3B1.1.(c) for Mr. Velez's role as a "leader" in the offense. The government would also agree not to seek an upward adjustment for sophisticated means and that Mr. Velez should be given credit for acceptance of responsibility under §3E1.1. Of course, the level of decrease under §3E1.1 would depend on the final offense level.

If you would like to discuss these terms further, call us at (202) 514-5145.

Sincerely yours,

J. RANDOLPH MANEY, JR.
Chief, Southern Criminal Enforcement Section

By: _____
Beth M. Elfrey
Trial Attorney

_____
Gregory E. Tortella
Trial Attorney

*Law Offices*

*Ira Marcus P. A.*

**888 EAST LAS OLAS BLVD. SUITE 710**
**FORT LAUDERDALE, FLORIDA 33301**
Telephone (954) 523-9696
Facsimile (954) 523-3858
e-mail address: ira.marcus@worldnet.att.net

**IRA MARCUS**
ALSO MEMBER OF MASSACHUSETTS
AND NEW JERSEY BARS

September 12, 2000

**SLOAN A. CARR**

**SENT VIA FACSIMILE 764-4996**

Marc Nurik, Esquire
200 East Broward Blvd.
15th Floor
Fort Lauderdale, FL 33301

**RE:    Back to Back Enterprises of Florida, Inc.'s Escrow Account**

Dear Marc:

This is to advise you that the Escrow Account being held at Smith Barney is in the name of Back to Back Enterprises of Florida, Inc., and represents corporate assets, specifically the proceeds of the sale of the gym as well as Promissory Note payments relating to the deferred purchase price. None of the funds in the Smith Barney Escrow Account are Sam Velez's personal assets. They are corporate assets, which are being held to pay corporate obligations.

Thank you for your attention. I remain

Very truly yours,

Dictated, but not reviewed by attorney
signed by secretary to expedite delivery

Ira Marcus

IM/cmc
cc: Sam Velez

S:\WPDOCS\GOLDS\GRIFF-BR\9-12 Nurik.ltr